IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 4, 2008 Session

COLONIAL PIPELINE COMPANY
v.
JOHN G. MORGAN ET AL.

Appeal by Permission from the Court of Appeals
Chancery Court for Davidson County
No. 05-748-IV    Richard H. Dinkins, Chancellor

No. M2006-00591-SC-R11-CV - Filed September 9, 2008

Colonial Pipeline Company filed suit for declaratory judgment, challenging the constitutionality of specified portions of the state tax code and seeking an injunction as to the enforcement of those provisions. The Chancery Court dismissed the action, holding that the company had failed to exhaust its administrative remedies. The Court of Appeals reversed and remanded. We granted an application for permission to appeal and, after consideration of the issues, hold that (1) a party making a constitutional challenge to the facial validity of a statute need not exhaust its administrative remedies, and that (2) the doctrine of sovereign immunity does not bar a suit for declaratory judgment asking state officers to be enjoined from enforcing such a statute so long as the action does not seek money damages. We, therefore, affirm the judgment of the Court of Appeals.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, JJ., and FRANK F. DROWOTA, III, Sp.J., joined.

Ron L. Quigley, Davis, Matthews & Quigley, P.C., and Stephen H. Price, Stites & Harbison, PLLC, for the appellee, Colonial Pipeline Company.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; and Mary Ellen Knack, Senior Counsel, for the appellant, State of Tennessee.

**OPINION**

**Facts and Procedural History**

On February 22, 2005, Colonial Pipeline Company ("Plaintiff"), a public utility that owns and operates a pipeline transportation system throughout thirteen states including Tennessee, filed

suit for declaratory judgment, contending that any tax assessment in excess of 40% as to its real property and 30% as to its personal property violates provisions of the state and federal constitutions. The defendants in this action are John Morgan, the Comptroller of the Treasury for the State of Tennessee; the State Board of Equalization; Governor Phil Bredesen in his capacity as a member and Chairman of the State Board of Equalization; Secretary of State Riley Darnell in his capacity as a member and Vice-Chairman of the State Board of Equalization; Dale Sims, State Treasurer, in his capacity as a member of the State Board of Equalization; Loren Chumley, the Commissioner of Revenue in her capacity as a member of the State Board of Equalization; Doyle Arp, the Assessor of Property of the State of Tennessee, in his capacity as a member of the State Board of Equalization; and J.M. Bailey, a member of the State Board of Equalization (the "Defendants").

In order to place this litigation in proper context, background information, both factual and legal, is in order. The Plaintiff is an interstate common carrier and transporter of refined petroleum commodities, such as heating oil, diesel fuel, kerosene, jet fuel, and gasoline, which supplies its products to a variety of destinations within a thirteen state area of service extending from Texas to New Jersey. Its system has eleven origination points and delivers to eighty-five locations along the pipeline. In order to install its pipelines, the Plaintiff has acquired easements from landowners and installed steel-coated pipes, typically located thirty or more inches under the surface of the soil. ANR Pipeline Co. v. Tenn. Bd. of Equalization, No. M2001-01098-COA-R12-CV, 2002 WL 31840689 (Tenn. Ct. App. Dec. 19, 2002). The term "pipelines" includes, among other things, pipes and fittings, cathodic protection equipment, valve operating mechanisms, and bypass assemblies. Id.

Our state government, of course, is empowered by the Tennessee Constitution to tax all real, personal, or mixed property, including that owned and operated by companies like the Plaintiff. Tenn. Const. art. II, § 28. Our constitution divides property into three classes: real property, tangible personal property, and intangible personal property. Id. Real property is further divided into four subclassifications, which are assessed at different rates:

(a) Public Utility Property, to be assessed at fifty-five (55%) percent of its value;

(b) Industrial and Commercial Property, to be assessed at forty (40%) percent of its value;

(c) Residential Property, to be assessed at twenty-five (25%) percent of its value, provided that residential property containing two (2) or more rental units is hereby defined as industrial and commercial property; and

(d) Farm Property, to be assessed at twenty-five (25%) percent of its value.

Id. Tangible personal property has three subclassifications, which are also assessed at different rates:

(a) Public Utility Property, to be assessed at fifty-five (55%) percent of its value;

(b) Industrial and Commercial Property, to be assessed at thirty (30%) percent of its value; and

(c) All other Tangible Personal Property, to be assessed at five (5%) percent of its value; provided, however, that the Legislature shall exempt Seven Thousand Five Hundred ($7,500) Dollars worth of such Tangible Personal Property which shall cover personal household goods and furnishings, wearing apparel and other such tangible property in the hands of a taxpayer.

Id. The task of classifying intangible personal property has been expressly delegated to the General Assembly. Id. Our constitution requires both that the ratio of assessment to value of property should be "equal and uniform throughout the State," and that "the value and definition of property in each class or subclass to be ascertained in such manner as the Legislature shall direct." Id. Further, every taxing authority must "apply the same tax rate to all property within its jurisdiction." Id.

Local governments evaluate and assess most commercial and residential property in Tennessee. See Tenn. Const. art. II, § 29 ("The General Assembly shall have power to authorize the several counties and incorporated towns in this State, to impose taxes for County and Corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation."). Certain subcategories of property, however, are assessed by a centralized state agency–the Office of State Assessed Properties ("OSAP"). Tenn. Code Ann. § 67-5-1301 (2006 & Supp. 2007). Taxpayers may challenge OSAP's assessments by filing an appeal with the Tennessee State Board of Equalization (the "Board" or "Board of Equalization"), the final administrative authority for the assessment of all centrally-assessed utilities. Tenn. Code Ann. § 67-5-1328 (2006). Because the Plaintiff is a public utility, OSAP assesses the value of its properties.

Until 1997, OSAP assessed the operating property of all taxable public utilities at the same value (55%). Following the settlement of a lawsuit brought by several airlines and railroads to equalize taxes of locally-assessed property and centrally-assessed property, the Board of Equalization directed OSAP to reduce the assessment value of personal property owned by centrally-assessed taxpayers.[1] This order was filed on September 30, 1997. Shortly after this change in the tax law, the Plaintiff sought to classify its "operating pipeline" as personal property and, thereby, reduce its

---

[1] OSAP uses the unit method of appraisal for public utilities. It appraises all operating property as a single unit, which produces one unit value. This unit value is apportioned to the state of Tennessee according to the apportionment formula derived from the factors listed in Tennessee Code Annotated section 67-5-1322. The public utility assessment percentage is applied to Tennessee's share of the unit value. After that, OSAP allocates Tennessee's share of the unit value from a particular company among the respective county and municipality governments where that company operates. Tenn. Code Ann. § 67-5-1323 (2007). The distribution is made in proportion to the company's gross investment in those counties. Finally, the counties and municipalities issue ad valorem tax bills, which are calculated from multiplying the local millage rates by the portion of operating property allocated to the county or municipality. The aggregate of these bills represents the utility's property tax liability in the State of Tennessee.

tax liability pursuant to the September 30 order. OSAP, however, recommended to the Board of Equalization that pipelines should be classified as real property. The Board consolidated the Plaintiff's application for relief with two similar cases. After an administrative law judge agreed with OSAP's recommendation, the Board declined to reclassify the pipeline as personal property. See Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii); Tenn. R. App. P 12(h). On direct appeal, however, our Court of Appeals reversed, concluding that the statutory definitions and common law rules applicable to the trade fixtures warranted classification as personal property. ANR Pipeline Co., 2002 WL 31840689 at *2-4 (citing Tenn. Code Ann. § 67-5-501(9), (12)). This Court denied the application for permission to appeal. In consequence, the Plaintiffs were entitled to a lower assessed value for tax purposes.

On May 18, 2004, the General Assembly, by the enactment of chapter 719 of the 2004 Public Acts, amended Tennessee Code Annotated section 67-5-501, modifying the definition of real property to include

[m]ains, pipes, pipelines and tanks permitted or authorized to be built, laid or placed in, upon, or under any public or private street or place for conducting steam, heat, water, oil, electricity or any property, substance or product capable of transportation or conveyance therein or that is protected thereby, excluding propane tanks for residential use and above ground storage tanks that can be moved without disassembly and are not affixed to the land[.]

Tenn. Code Ann. § 67-5-501(9)(B)(iii). The passage of chapter 719 required, on a prospective basis, that the Plaintiff's pipeline be subjected to the higher real property assessment.

The Plaintiff challenged the propriety of the higher assessment by filing an exception. See Tenn. Code Ann. § 67-5-1327(b)-(c) (2005). On September 7, 2004, Tom Fleming, Assistant to the Comptroller for Assessments, sent the Plaintiffs a letter, which stated as follows:

The exception filed on behalf of [Colonial] raised issues regarding equalization and classification. In accordance with the statement read at the hearing on August 18, 2004, equalization is a function of the State Board of Equalization. The issue of classification is a matter of pending litigation.

Any further request for equalization must be filed with the State Board of Equalization (IN WRITING NO LATER THAN SEPTEMBER 27, 2004) to the attention of [Kelsie Jones, Executive Secretary].

Later, Fleming filed an affidavit, admitting that the reference to "pending litigation" was a mistake and confirming that the Plaintiff was not actually party to litigation mentioned in the letter. The Plaintiff filed an appeal with the Board of Equalization and a status conference was set. The conference was then continued "to accommodate Colonial's desire to explore resolution of its assessment classification issues before the Tennessee Tax Study Commission and the Tennessee

General Assembly before the hearing or prehearing conference on [the] appeal resumed." No further action has been taken; technically, the appeal was pending at the time this lawsuit was filed.

The Plaintiff sought injunctive and declaratory relief in the Davidson County Chancery Court.[2] The provisions at issue include subclassifications (a) and (b) of article II, section 28 of the Tennessee Constitution and Tennessee Code Annotated sections 67-5-501(8)(G), -502(b), -1302(a).

The Defendants filed a motion to dismiss pursuant to Tennessee Rule of Civil Procedure 12.02, arguing first that the Chancery Court did not have jurisdiction because the Plaintiff had failed to exhaust its administrative remedies with the Board of Equalization and, second, because the Declaratory Judgment Act does not authorize suits against state officials. The Chancellor granted the Defendants' motion to dismiss, holding only that the Plaintiff failed to exhaust its administrative remedies with the Board as provided by Tennessee Code Annotated section 67-5-1301 et seq. The issue of whether the Declaratory Judgment Act authorized a suit against the State officers was not addressed.

On direct appeal, our Court of Appeals treated the Chancellor's ruling, which included a reference to "the entire record," as a summary judgment. Tenn. R. Civ. P. 56; Tenn. R. Civ. P. 12.02 ("If, on a motion asserting the defense numbered (6) to dismiss for failure to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."). After considering the merits of the claim, the Court of Appeals concluded that neither of the two grounds relied upon by the Defendants would preclude the declaratory judgment action. We granted the Defendants' application for permission to appeal pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure.

**Analysis**

The Defendants contend that the Court of Appeals erred by (1) holding that the Chancery Court had jurisdiction to hear the constitutional challenge without Colonial first submitting the claim to the Board of Equalization and (2) holding that declaratory judgment is an available remedy against state officers in tax cases. The issues require us to interpret several statutes, including the Declaratory Judgement Act. See Tenn. Code Ann. § 29-14-101 to -113 (2000 & Supp. 2007).

---

[2] On February 24, 2005, the Plaintiff also sued the Board of Equalization and its individual members ("Defendants") in the Federal District Court for the Middle District of Tennessee, contending that the Defendants' classification of its operating property violated the Equal Protection Clause, Commerce Clause, and Supremacy Clause of the United States Constitution, as well as the Tennessee Constitution. Colonial Pipeline Co. v. Morgan, 231 F.R.D. 518 (M.D. Tenn. 2005). The Plaintiff sought declaratory and injunctive relief. The federal court did not reach the merits of the constitutional claims, however, and dismissed the action pursuant to the Tax Injunction Act. The court found that federal review was inappropriate because Colonial had "a plain, speedy, and efficient remedy" before the Board of Equalization and the Tennessee state courts. 28 U.S.C. § 1341 ("The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."). The Court of Appeals for the Sixth Circuit affirmed the district court's dismissal. Colonial Pipeline Co. v. Morgan, 474 F.3d 211 (6th Cir. 2007).

Because declaratory relief is being sought against a state administrative board and state officers acting in their official capacity, we must construe our Act against the backdrop of administrative law, justiciability principles, sovereign immunity, and separation of powers.

**Standard of Review**

For issues involving questions of law, our standard of review is de novo with no presumption of correctness. Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003); Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997). The standard of review for issues of fact is de novo upon the record accompanied by a presumption of correctness of the trial court's findings, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2) (2005). Issues of constitutional interpretation are a questions of law, which we review de novo without any presumption of correctness given to the legal conclusions of the courts below. State v. Burns, 205 S.W.3d 412, 414 (Tenn. 2006) (citing S. Constructors, Inc. v. Loudon County Bd. of Educ., 58 S.W.3d 706, 710 (Tenn. 2001)).

When dealing with statutory interpretation, well-defined precepts apply. Our chief concern is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. Abels ex rel. Hunt v. Genie Indus. Inc., 202 S.W.3d 99, 102 (Tenn. 2006). When a statute is ambiguous, however, we may reference the broader statutory scheme, the history of the legislation, or other sources. Parks v. Tenn. Mun. League Risk Mgmt. Pool, 974 S.W.2d 677, 679 (Tenn. 1998). We presume the General Assembly was aware of its prior enactments at the time it passed the legislation. Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995).

**I. Exhaustion of Administrative Remedies**

**A. The Declaratory Judgment Act**

A declaratory judgment action is a relative novelty in the law. Snow v. Pearman, 436 S.W.2d 861, 863 (Tenn. 1968) (observing that "the declaratory judgment procedure does not come to the jurisprudence of Tennessee from antiquity"). The common law did not allow a suit in either law or equity absent an actual and present injury. Clein v. Kaplan, 40 S.E.2d 133, 137 (Ga. 1946). In recent centuries, however, declaratory judgment actions have gained popularity as a proactive means of preventing injury to the legal interests and rights of a litigant. One commentator has observed that the declaratory judgment action recognizes that "[c]ourts should operate as preventive clinics as well as hospitals for the injured." Henry R. Gibson, Gibson's Suits in Chancery, § 545 (6th ed. 1982). This evolution in the law has been achieved largely by statutory enactment. In the 1850's, the English Declaratory Judgment Act was passed. 15 & 16 Vict. Chap. 86. In 1922, the Conference

of Commissioners on Uniform State laws drafted the first Uniform Declaratory Judgment Act.[3] One year later, the Tennessee General Assembly adopted this legislation. Act of Feb. 9, 1923, ch. 29, 1923 Tenn. Pub. Acts 105 (now codified at Tenn. Code Ann. §§ 29-14-101 to -113 (2000 & Supp. 2007)). The stated purpose was to "settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." Id. at § 12.

"Declaratory judgments" are so named because they proclaim the rights of the litigants without ordering execution or performance.[4] 26 C.J.S. Declaratory Judgments § 1 (2001). Their purpose is to settle important questions of law before the controversy has reached a more critical stage. 26 C.J.S. Declaratory Judgments § 3 (2001). The chief function is one of construction. Hinchman v. City Water Co., 167 S.W.2d 986, 992 (Tenn. 1943) (quoting Newsum v. Interstate Realty Co., 278 S.W. 56, 56-57 (Tenn. 1925)). While findings of fact are permitted in a declaratory judgment action, "the settlement of disputed facts at issue between the parties will ordinarily be relegated to the proper jurisdictional forums otherwise provided." Id.

In its present form, the Tennessee Declaratory Judgment Act grants courts of record the power to declare rights, status, and other legal relations. Tenn. Code Ann. § 29-14-102 (2000). The Act also conveys the power to construe or determine the validity of any written instrument, statute, ordinance, contract, or franchise, provided that the case is within the court's jurisdiction. Tenn. Code Ann. § 29-14-103 (2000). Of particular relevance to this case, the Act provides that "[a]ny person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder." Id. Declaratory judgment statutes are remedial in nature and should be construed broadly in order to accomplish their purpose. Tenn. Code Ann. § 29-14-113 (2000); Shelby County Bd. of Comm'rs v. Shelby County Quarterly Court, 392 S.W.2d 935, 941 (Tenn. 1965).

Although a plaintiff in a declaratory judgment action need not show a present injury, an actual "case" or "controversy" is still required. Cardinal Chem. Co. v. Morton Int'l, 508 U.S. 83, 95 (1993) (stating that "a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy"). A bona fide disagreement must exist; that is, some real

_____

[3] At first, American courts approached declaratory judgments with skepticism. See Liberty Warehouse Co. v. Grannis, 273 U.S. 70, 76 (1927) (holding that a federal district court had no jurisdiction to entertain a declaratory judgment action under Kentucky law); Anway v. Grand Rapids Ry. Co., 179 N.W. 350, 361 (Mich. 1920) (finding that an early declaratory judgment act was void because it was non-judicial in character). However, this Court upheld the constitutionality of Tennessee's Declaratory Judgment Act shortly after it was passed. Miller v. Miller, 261 S.W. 965 (Tenn. 1923); see also Justiciability of Suits for Declaratory Judgments – Federal Rule, 11 Tenn. L. Rev. 294 (1933). In a case involving facts similar to the case at bar, the United States Supreme Court also affirmed the constitutionality of our Act. Nashville, C. & S. L. Ry. v. Wallace, 288 U.S. 249 (1933). The Court noted that the "Constitution does not require that the case or controversy should be presented by traditional forms of procedure, invoking only traditional remedies." Id. at 264.

[4] Tennessee allows for additional relief based upon a declaratory judgment. Tenn. Code Ann. § 29-14-111 (2007).

interest must be in dispute.  Goetz v. Smith, 278 S.W. 417, 418 (Tenn. 1925).  Courts still may not render advisory opinions based on hypothetical facts.  Third Nat'l Bank v. Carver, 218 S.W.2d 66, 69 (Tenn. Ct. App. 1948).  The justiciability doctrines of standing, ripeness, mootness, and political question continue as viable defenses.  See, e.g., Texas v. United States, 523 U.S. 296 (1998) (finding a declaratory judgment action was not ripe); Cardinal Chem., 508 U.S. at 83 (finding a declaratory judgment action was moot).  Moreover, in disputes involving a state agency, one must generally exhaust the available administrative remedies before filing a suit for declaratory relief.[5]  See Abington Ctr. Assocs. Ltd. P'ship v. Baltimore County, 694 A.2d 165,  170 (Md. Ct. Spec. App. 1997); see also Tenn. Code Ann. § 4-5-225 (2005 & Supp. 2007).  Subject to some exceptions, a declaratory judgment action should not be considered where special statutory proceedings provide an adequate remedy.  Katzenbach v. McClung, 379 U.S. 294, 296 (1964).  This includes administrative remedies prescribed under the Uniform Administrative Procedures Act ("UAPA") and other relevant sections of the Tennessee Code.

### B. Exhaustion of Administrative Remedies Doctrine

The exhaustion doctrine has been recognized at common law as an exercise of judicial prudence.  Justice Brandeis referred to it as "the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."  Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51 (1938).  When a claim is first cognizable by an administrative agency, therefore, the courts will not interfere "until the administrative process has run its course."  United States v. W. Pac. R.R. Co., 352 U.S. 59, 63 (1956).  Both courts and legislatures have recognized that the exhaustion doctrine promotes judicial efficiency and protects administrative authority in at least three ways.  First, sometimes "[j]udicial intervention may not be necessary because the agency can correct any initial errors at subsequent stages of the process[, and] the agency's position on important issues of fact and law may not be fully crystallized or adopted in final form."  Ticor Title, 814 F.2d at 735 (quoting Gellhorn & Boyer).  Secondly, exhaustion allows the agency to develop a more complete administrative record upon which the court can make its review.  Efco Tool Co. v. Comm'r, 81 T.C. 976, 981 (1983).  Finally, cases that concern subject matter within the purview of administrative agencies often involve "specialized fact-finding, interpretation of disputed technical subject matter, and resolving disputes

---

[5] "'Ripeness and exhaustion are complementary doctrines which are designed to prevent unnecessary or untimely judicial interference in the administrative process.'"  Ticor Title Ins. Co. v. FTC, 814 F.2d 731, 735 (D.C. Cir. 1987) (quoting E. Gellhorn & Boyer, Administrative Law and Process 316-19 (1981) (hereinafter "Gellhorn & Boyer")).  While these doctrines are similar, they involve different requirements and are designed to achieve different purposes.  In an attempt to distinguish these doctrines, the Court of Appeals for the District of Columbia noted:

> The exhaustion doctrine emphasizes the position of the party seeking review; in essence, it asks whether he may be attempting to short circuit the administrative process or whether he has been reasonably diligent in protecting his own interests.  Ripeness, by contrast, is concerned primarily with the institutional relationships between courts and agencies, and the competence of the courts to resolve disputes without further administrative refinement of the issues.

Ticor Title, 814 F.2d at 735 (quoting Gellhorn & Boyer).  In short, exhaustion focuses on the actions of the party seeking relief, and ripeness focuses on separation of powers.

concerning the meaning of the agency's regulations." West v. Bergland, 611 F.2d 710, 715 (8th Cir. 1979) (citations omitted). Requiring that administrative remedies be exhausted often leaves courts better equipped to resolve difficult legal issues by allowing an agency to "'perform functions within its special competence.'" Id. (quoting Parisi v. Davidson, 405 U.S. 34, 37 (1972)).

While the doctrine arose as a discretionary rule in courts of equity, today many exhaustion requirements are mandated by legislation. See Smith v. United States, 199 F.2d 377, 381 (1st Cir. 1952). When a statute provides specific administrative procedures, "one claiming to have been injured must first comply with the provisions of the administrative statute." State v. Yoakum, 297 S.W.2d 635, 641 (Tenn. 1956) (citing State ex rel. Jones v. City of Nashville, 279 S.W.2d 267 (Tenn. 1955)). The mere fact that an agency probably will deny relief is not a sufficient excuse for failure to exhaust available remedies. Id. Exhaustion of administrative remedies is not an absolute prerequisite for relief, however, unless a statute "'by its plain words'" requires exhaustion. Thomas v. State Bd. of Equalization, 940 S.W.2d 563, 566 (Tenn. 1997) (quoting Reeves v. Olsen, 691 S.W.2d 527, 530 (Tenn. 1985)). Thus, a statute does not require exhaustion when the language providing for an appeal to an administrative agency is worded permissively. Id. Absent any statutory mandate, whether to dismiss a case for failure to exhaust administrative remedies would be a matter of "'sound judicial discretion.'" Reeves, 691 S.W.2d at 530 (quoting Cerro Metal Prod. v. Marshall, 620 F.2d 964, 970 (3d Cir. 1980)).

### C. Title 67

The Defendants assert that under the facts of this case, the portion of the Tennessee Code that pertains to the tax classification of utilities and carriers requires exhaustion through the Board. Tenn. Code Ann. §§ 67-5-1301 to -1334 (2006 & Supp. 2007). Upon its review of the statute, the Court of Appeals found no such requirement. In making this determination, the Court of Appeals placed particular emphasis on the language in section 67-5-1328, which outlines the power of the Board to review assessments made by OSAP. Relying on our opinion in Thomas, the Court of Appeals found that section 67-5-1328 provided an administrative remedy, but that the plain words of the statute did not require the Plaintiff to exhaust that remedy through the Board.

We disagree with that rationale. The language in the preceding section of the statute provides as follows:

(b) Within ten (10) days from the first Monday in August, any owner, or user, the state or any county, municipality, or incorporated town may appear and file exceptions to such assessment, together with such evidence as the owner, user, state, county, municipality or incorporated town may desire to submit as to the value of the property assessed, and at the expiration of the ten (10) days, the comptroller of the treasury shall convene an informal hearing and examine such additional evidence and exceptions as may have been filed, and act thereon, either changing or affirming its valuation. All persons or entities authorized to file an exception under this section but failing to file an exception within the time permitted shall be deemed to have waived any objection to the assessments.

(c) On or before the first Monday in September, the comptroller of the treasury shall file with the board of equalization the assessments made by the comptroller, together with such records as may be deemed necessary. The comptroller of the treasury shall send notice to any person or entity filing an exception to the action taken on the exception, and persons or entities affected by the comptroller of the treasury's action on the exceptions may file further exceptions with the state board of equalization, for review pursuant to § 67-5-1328. All persons or entities authorized to file an exception under this section but failing to do so on or before twenty (20) days from the first Monday in September shall be deemed to have waived any objection they may otherwise have raised with regard to the assessments.

Tenn. Code Ann. § 67-5-1327 (2006) (emphasis added). In our view, the plain words of this statute direct that all taxpayers who, within the designated time period, fail to file an exception to their notice of assessment waive all objections to their assessments. Section 67-5-1327 clearly sets forth mandatory, not permissive, administrative procedures. The failure to exhaust the administrative remedies outlined in the statute effectively waives the right to protest OSAP's assessment, whether suit be brought in an administrative or judicial forum.

Nevertheless, the Court of Appeals correctly concluded that our tax code does not preclude altogether the Plaintiff's suit for declaratory judgment. The controversy in this case is not whether the Plaintiff's property was incorrectly assessed in any given year, but whether the applicable provisions violate constitutional principles. The Plaintiff sought declaratory and injunctive relief, not money damages or a tax refund. While the Plaintiff did appeal its 2004 assessment to the Board, the appeal is still pending. Moreover, the subject matter of its suit for a declaratory judgment was of a different nature. While the Defendants correctly assert that taxpayers must exhaust administrative remedies to appeal a final decision of the Board, section 67-5-1327 is not a barrier to a constitutional challenge to the facial validity of the statute.

The Defendants' reliance on our opinion in Northwest Airlines v. Tennessee State Board of Equalization, 861 S.W.2d 232 (Tenn. 1993), is misplaced. In that case, we answered a certified question from the United States Court of Appeals for the Sixth Circuit, holding that "the proper procedure to challenge the assessment of centrally assessed commercial air carrier property taxes is to pay them under protest and to file a petition for review with the Middle Division of the Court of Appeals." Id. at 236 (emphasis added) (citing Tenn. Code Ann. § 67-5-1329(b); § 4-5-322(b)(1)). We based our holding on Tennessee Code Annotated section 67-5-1329(b), which states, "If any railroad or public utility has been or is hereafter aggrieved at the assessment so fixed and certified by the board, such railroad or public utility shall be required to pay the taxes due and owing the state, counties and municipalities, upon the full value of the assessment, under protest" before challenging the assessment in court. Tenn. Code Ann. § 67-5-1329(b) (emphasis added). We also relied upon a section of the Uniform Administrative Procedures Act that deals with appeals of agency decisions. Nw. Airlines, 861 S.W.2d at 236. This case is different. The Plaintiff does not seek a judicial review of an administrative decision. See Hinchman, 167 S.W.2d at 992. The question is one of constitutionality.

In the same vein, section 4-5-322 of the UAPA does not apply. Tennessee's Uniform Administrative Procedures Act contemplates two methods of challenging the acts of an agency, setting forth different procedures for seeking declaratory relief and for appealing a final administrative decision. Compare Tenn. Code Ann. § 4-5-225, with Tenn. Code Ann. § 4-5-322 (2005 & Supp. 2007). Whether the Plaintiff has satisfied the procedural requirements of the UAPA for bringing a direct action for declaratory judgment merits further analysis.

### D. Uniform Administrative Procedures Act[6]

The UAPA applies in this instance because the Board of Equalization falls under its definition of "agency." Tenn. Code Ann. § 4-5-102(2) ("'Agency' means each state board, commission, committee, department, officer, or any other unit of state government authorized or required by any statute or constitutional provision to make rules or to determine contested cases."). Before considering the UAPA's exhaustion requirements, we first observe that the Act was intended to be construed in accord with common law principles. Tenn. Code Ann. § 4-5-103(a) (stating that the Act should not be construed "in derogation of the common law"). Further, the UAPA is remedial legislation and, as such, should be liberally construed, "and any doubt as to the existence or the extent of a power conferred shall be resolved in favor of the existence of the power." Id.

The procedural posture of this case requires us to review the portion of the UAPA dealing with declaratory judgments and declaratory orders. See Tenn. Code Ann. §§ 4-5-223 to -225 (2005 & Supp. 2007). Section 4-5-225 directly addresses the situations in which the Davidson County Chancery Court has jurisdiction to render a declaratory judgment regarding statutes within the primary jurisdiction of any state agency:

(a) The legal validity or applicability of a statute, rule or order of an agency to specified circumstances may be determined in a suit for a declaratory judgment in the chancery court of Davidson County, unless otherwise specifically provided by statute, if the court finds that the statute, rule or order, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the complainant. The agency shall be made a party to the suit.

(b) A declaratory judgment shall not be rendered concerning the validity or applicability of a statute, rule or order unless the complainant has petitioned the agency for a declaratory order and the agency has refused to issue a declaratory order.

(c) In passing on the legal validity of a rule or order, the court shall declare the rule or order invalid only if it finds that it violates constitutional provisions, exceeds the statutory authority of the agency, was adopted without compliance with the

---

[6] This issue was not addressed by the Court of Appeals. The Defendants cite the UAPA procedure for obtaining a declaratory order and assert that Colonial has failed to petition the Board "or any other state agency for a declaratory order as to the statute's validity, a condition precedent to maintaining any state court action for declaratory relief under the UAPA." (citing Tenn. Code Ann. § 4-5-225(b)). The Defendants also argue that Colonial did not follow the proper "procedures for obtaining review of its constitutional issues."

rulemaking procedures provided for in this chapter or otherwise violates state or federal law.

Tenn. Code Ann. § 4-5-225 (emphasis added). In no uncertain terms, this statute requires a prospective plaintiff to make a request for a declaratory order with an agency before bringing an action for a declaratory judgment in the Chancery Court. See Watson v. Tenn. Dep't of Corr., 970 S.W.2d 494 (Tenn. Ct. App. 1998). A declaratory order issued by an administrative tribunal is roughly analogous to a declaratory judgment issued by a court. The UAPA sets forth the procedures that a party should take to petition an agency for a declaratory order:

(a) Any affected person may petition an agency for a declaratory order as to the validity or applicability of a statute, rule or order within the primary jurisdiction of the agency. The agency shall:

(1) Convene a contested case hearing pursuant to the provisions of this chapter and issue a declaratory order, which shall be subject to review in the chancery court of Davidson County, unless otherwise specifically provided by statute, in the manner provided for the review of decisions in contested cases; or

(2) Refuse to issue a declaratory order, in which event the person petitioning the agency for a declaratory order may apply for a declaratory judgment as provided in § 4-5-225.

Tenn. Code Ann. § 4-5-223 (emphasis added). The Defendants point out that the Plaintiff never petitioned the Board for a declaratory order, and, therefore, failed to exhaust its remedies under the UAPA.

In L.L. Bean, Inc. v. Bracey, 817 S.W.2d 292 (Tenn. 1991), a taxpayer sought a declaratory judgment and injunctive relief under Tennessee's Declaratory Judgment Act and 42 U.S.C. § 1983. This Court held that the Chancery Court lacked jurisdiction on several grounds, one of which was failure to comply with section 4-5-225 (formerly section 4-5-224). Id. at 293. The ruling concluded that the Chancery Court was "without jurisdiction to consider the constitutionality of a statute pursuant to [Tennessee Code Annotated section 4-5-225], when the issue has not first been presented to an administrative agency pursuant to [Tennessee Code Annotated section] 4-5-223." Id. at 298. The opinion prohibited the Chancery Court from issuing a declaratory judgment regarding the constitutionality of "a statute dealing with state tax revenue if such exercise of jurisdiction would . . . be in conflict with and undermine the exclusive jurisdiction for determining liability for taxes that is bestowed by" Tennessee Code Annotated section 67-1-1804. Id. In L.L. Bean, this Court relied upon a Court of Appeals decision that state agencies have "the authority to consider the constitutionality of a statute." Id. (citing Crawford v. Consol. Ret. Sys., 732 S.W.2d 293 (Tenn. Ct. App. 1987)).

Later, however, we reconsidered the basis for the opinion in L.L. Bean. In Richardson v. Board of Dentistry, 913 S.W.2d 446 (Tenn. 1995), this Court observed that the facial constitutionality of a statute may not be determined by an administrative tribunal due to "the fundamental constitutional principle of separation of powers." Id. at 453 (citing State ex rel. Town of S. Carthage v. Barrett, 840 S.W.2d 895, 897 (Tenn. 1992)).[7] In Richardson, we recognized that "it has been the sole obligation of the judiciary to interpret the law and determine the constitutionality of actions taken by the other two branches of government." Id. at 453 (citing Tenn. Small Sch. Sys. v. McWherter, 851 S.W.2d 139, 148 (Tenn. 1993)). The Tennessee Constitution prohibits one branch from encroaching on the powers or functions of the other two branches.[8] Id. (citing Tenn. Const. art. II, § 2; State v. Brackett, 869 S.W.2d 936, 939 (Tenn. Crim. App. 1993)). We did not expressly overrule L.L. Bean, but in discussing whether administrative agencies have the power to consider constitutional challenges to statutes, we acknowledged that both the L.L. Bean and Crawford cases had "spawned confusion on the applicable Tennessee rule." Richardson, 913 S.W.2d at 453.

Administrative tribunals do not lack the authority to decide every constitutional issue. It is essential, however, to distinguish between the various types of constitutional issues that may arise in the administrative context. In Richardson, we developed three broad categories of constitutional disputes: (1) challenging the facial constitutionality of a statute authorizing an agency to act or rule, (2) challenging the agency's application of a statute or rule as unconstitutional, or (3) challenging the constitutionality of the procedure used by an agency. Id. at 454-55. Administrative tribunals have the power to decide constitutional issues falling into the second and third categories, but the first category falls exclusively within the ambit of the judicial branch. Id. The separation of powers clause reserves for the judiciary constitutional challenges to the facial validity of a statute. Id. (citing Hoover Motor Exp. Co., Inc. v. R.R. & Pub. Util. Comm'n, 261 S.W.2d 233, 238 (Tenn. 1953); Pharr v. Nashville, C., & St. L. Ry., 208 S.W.2d 1013, 1017 (Tenn. 1948)).

---

[7] We also noted that this limitation on administrative agencies is recognized in many other jurisdictions. Richardson, 913 S.W.2d 452-53 (citing Downen v. Warner, 481 F.2d 642, 643 (9th Cir. 1973) (resolving claim based on constitutional right is inappropriate for an administrative board); Alleghany Corp. v. Pomeroy, 698 F. Supp. 809, 813-14 (D.N.D. 1990), rev'd on other grounds, 898 F.2d 1314 (8th Cir. 1990) (agency without power to adjudicate constitutional issues); Key Haven v. Bd. of Trustees of the Internal Impr'mt. Trust Fund, 427 So. 2d 153 (Fla. 1982) (forum for consideration of constitutional question was in court upon judicial review); Mobil Oil Corp. v. City of Rocky River, 309 N.E.2d 900 (Ohio 1974) (constitutionality of zoning ordinance is matter for the court); Dow Jones & Co. v. State ex rel. Okla. Tax Comm'n, 787 P.2d 843 (Okla. 1990) (commissioner properly refused to address constitutional issues); Belco Petroleum Corp. v. State Bd. of Equalization, 587 P.2d 204, 208 (Wyo. 1978) (agency does not determine facial constitutionality of statute or constitutionality of its application); 73 C.J.S. Public Administrative Law and Procedure § 65 at 536; 1 Am. Jur.2d Administrative Law § 185 at 989-90).

[8] In general, the "legislative power" is the authority to make, order, and repeal law; the "executive power" is the authority to administer and enforce law; and the "judicial power" is the authority to interpret and apply law. The Tennessee constitutional provision prohibits an encroachment by any of the departments upon the powers, functions and prerogatives of the others. Richardson v. Young, 125 S.W. 664 (1910). The branches of government, however, are guided by the doctrine of checks and balances; the doctrine of separation of powers is not absolute. Anderson County Quarterly Court v. Judges of 28th Judicial Circuit, 579 S.W.2d 875 (Tenn. Ct. App. 1978).

Since Richardson, we have consistently held that administrative proceedings are not the proper forum for certain narrow constitutional claims. Helms v. Tenn. Dep't of Safety, 987 S.W.2d 545, 546 n.1 (Tenn. 1999). For example, in City of Memphis v. Shelby County Election Commission, 146 S.W.3d 531 (Tenn. 2004), the Shelby County Election Commission refused to place a referendum order on the election ballot because the commission determined that the proposed ordinance would be unconstitutional. Id. at 533. This Court ruled that the election commission had exceeded its authority under the separation of powers clause of our constitution because it had "usurped the power of the judiciary to determine the substantive constitutionality of duly enacted laws." Id. at 538. Officials within the executive or legislative branch were prohibited from determining the substantive constitutionality of duly enacted, presumptively valid ordinances. Id.

We have yet to address how the separation of powers clause would affect the requirement to petition for a declaratory order under section 4-5-225. In Richardson, the plaintiff had actually petitioned the agency for a declaratory order before suing for a declaratory judgment in the Chancery Court, and, upon the advice of an administrative law judge, the Board of Dentistry had held that it was without jurisdiction to hear constitutional challenges to the statute. Id. at 450-51. Here, the Plaintiff did not petition the Board for a declaratory order before suing for declaratory judgment. The question, therefore, becomes whether one must first petition an agency for a declaratory order before seeking a summary judgment to determine the facial validity of a statute. Section 4-5-223 specifically allows an aggrieved party to petition for a declaratory order challenging the "validity or applicability of a statute, rule or order within the primary jurisdiction of the agency."

The definitions found in the statute applicable to the Board of Equalization pertain directly to the classification and assessment of property. The enabling legislation provides that the Board "has jurisdiction over the valuation, classification and assessment of all properties in the state." Tenn. Code Ann. § 67-5-1501(a) (2005). Further, the Board has the duty to "receive, hear, consider and act upon complaints and appeals." Tenn. Code Ann. § 67-5-1501(b) (2006 & Supp. 2007).

Despite the breadth of the jurisdictional provisions found in the statute, an agency does not have the authority to determine the facial validity of a statute under the constitutional requirement of separation of powers. Tenn. Const. art. II, § 2 ("No person or persons belonging to one of these [three] departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted."); Richardson, 913 S.W.2d at 452-53. The provision in the UAPA that an agency may issue a declaratory order regarding the "validity or applicability of a statute" is, therefore, in partial conflict with our ruling in Richardson. Tenn. Code Ann. § 4-5-223(a) (emphasis added). While an agency ruling on the "applicability" is permissible, the separation of powers clause in our constitution trumps any provision in the UAPA permitting a determination as to the "validity" of a statute. Richardson, 913 S.W.2d at 455 ("To vest an agency with the authority to determine the constitutionality of the legislation empowering the agency to act would violate the doctrine of the separation of powers."). In consequence, any provision requiring administrative review prior to a direct challenge to the facial validity of a statute violates our state constitution. See Tenn. Code Ann. § 4-5-225(b); see also State v. Yoakum, 297 S.W.2d 635, 642 (Tenn. 1956) ("The law will not require these [plaintiffs] to exhaust an administrative remedy when

-14-

to do so under the averments of the facts herein would be a useless thing."). "'The importance of correctly resolving constitutional issues suggests that constitutional issues should rarely be foreclosed by procedural technicalities.'" In re Adoption of Female Child, 42 S.W.3d 26, 32 (Tenn. 2001) (quoting Richardson, 913 S.W.2d at 457).

Our ruling in Richardson is consistent with the exhaustion of administrative remedies doctrine, which has recognized exceptions based on "equitable considerations of fairness to litigants and institutional competence." Ronald A. Cass, Colin S. Diver, & Jack M. Beermann, Administrative Law 320 (5th ed. 2006). In McCarthy v. Madigan, 503 U.S. 140 (1992),[9] the United States Supreme Court outlined three broad exceptions to the non-statutory exhaustion requirement: (1) when the administrative remedy would cause undue prejudice to subsequent assertion of a claim in court; (2) when the administrative remedy would be inadequate "'because of some doubt as to whether the agency was empowered to grant effective relief'"; and (3) when the administrative agency has been shown to be biased or has predetermined the issue. Id. at 146-49 (quoting Gibson v. Berryhill, 411 U.S. 564, 575 n.14 (1973)). The second exception has the most relevance in this case because the separation of powers doctrine renders the Board of Equalization powerless to adjudicate the Plaintiff's constitutional claims.[10] Elaborating on this exception in McCarthy, the Supreme Court observed that "an agency, as a preliminary matter, may be unable to consider whether to grant relief because it lacks institutional competence to resolve the particular type of issue presented, such as the constitutionality of a statute." Id. at 147-48 (emphasis added) (citing Moore v. East Cleveland, 431 U.S. 494, 497, n.5 (1977); Mathews v. Diaz, 426 U.S. 67, 76 (1976)). The Court further noted that even if the agency could adjudicate the matter, it might "lack authority to grant the type of relief requested." Id. at 148 (citing McNeese v. Bd. of Educ. for Cmty. Unit Sch. Dist., 187, 373 U.S. 668, 675 (1963)).

We agree with the assessment by our highest court. Our ruling today is meant to achieve harmony between the UAPA, the exhaustion of remedies doctrine, and the separation of powers clause. In view of the respective roles of administrative agencies and courts within the separation of powers framework, we hold that section 4-5-225 does not preclude the Chancery Court from considering a constitutional challenge to the facial validity of a statute even when the agency has not considered a declaratory order.

That said, we must now decide whether the Plaintiff's claims fall within this narrow exception to section 4-5-225(b). The prayer for relief in the complaint filed contains a mixture of

---

[9] This case was not controlled by the exhaustion requirement found in the federal Administrative Procedures Act. It dealt with prisoners seeking damages against federal officers for violations of their constitutional rights. McCarthy has since been overruled on this point due to a change in the statute governing suits by prisoners. 42 U.S.C. § 1997e; Booth v. Churner, 532 U.S. 731, 741 (2001).

[10] The court in McCarthy based its holding on this exception. See id. at 155 (stating "the uncertainty of the administrative agency's authority to award relief counsels against requiring exhaustion"); see also id. at 156 (Rehnquist, J., concurring) (agreeing with the majority's outcome because the administrative "remedy furnishes no effective remedy at all").

constitutional challenges; to a certain extent, both facial validity and statutory application are at issue. Questions of whether the <u>application</u> of a statute violates constitutional principles should be submitted to the agency through a petition for a declaratory order before any action is brought in the Chancery Court. Tenn. Code Ann. § 4-5-225(b). Questions of constitutional <u>validity</u> need not be. <u>Richardson</u>, 913 S.W.2d at 454-55.

In its complaint, the Plaintiff asked the Chancery Court to "[d]eclare that the amendments to [Tenn. Code Ann.] § 67-5-501(9) embodied in Chapter 719 are unconstitutional and unenforceable." The Plaintiff further asked for injunctive relief to prevent the enforcement of the disputed statutory provisions and reaffirm the 2002 decision of the Court of Appeals. These prayers for relief qualify as facial attacks because they focus on the language and effect of the statutes themselves. The Plaintiff also asked that the court prevent enforcement of the disputed statutes "to the extent [they] impose assessment rates upon Colonial'[s]" real and personal operating property in excess of 40% and 30%, respectively. While this may require the Chancery Court to consider how the statutes have been specifically applied to the Plaintiff, the ultimate resolution of these issues depends predominately upon whether the underlying statutes comply with constitutional mandates. Viewed as a whole, this suit is best characterized as a facial attack challenging the validity of certain statutes and state constitutional provisions. Thus, we determine that because the Plaintiff's complaint predominately raised issues of statutory validity, the Chancery Court improperly dismissed this complaint for failure to exhaust administrative remedies. We remand this suit to the Chancery Court for consideration on the merits.

## II. Allegations of Bias and Prejudgment by the Board

The Plaintiff also asserts that it should be excused from all exhaustion requirements because the Board cannot provide fair and impartial review, thereby violating the Plaintiff's right to procedural due process. <u>See</u> <u>Withrow v. Larkin</u>, 421 U.S. 35, 46-47 (1975) (stating due process requires a fair trial in front of a fair tribunal in administrative adjudication). The Plaintiff makes a two-fold argument: (1) the Board has prejudged the issue by taking an official adverse position, and (2) there is insufficient separation between the Board and other branches of government.

In support of its claim that the Board has prejudged the issue, the Plaintiff relies heavily upon <u>Northwest Airlines v. Tennessee State Board of Equalization</u>, 11 F.3d 70, 73 (6th Cir. 1992). In that case, the Sixth Circuit of the United States Court of Appeals held that the Tax Injunction Act did not bar a suit for injunctive relief against the Board of Equalization in the federal district court because there was no "plain, speedy, and efficient remedy" in the state court; the Sixth Circuit explained that the Board was involved in pending litigation in which it had asserted a position directly adverse to Northwest Airlines's claim. <u>Id.</u> at 72. Because of these "peculiar" facts, the court permitted the case to proceed in the federal district court as a "rare exception" to the general rule under the Tax Injunction Act. <u>Id.</u> at 73.

The Tax Injunction Act restrains federal courts only and has no application to the jurisdiction of the Davidson County Chancery Court. <u>See</u> 28 U.S.C. § 1341 ("The <u>district courts</u> shall not enjoin,

suspend or restrain the assessment, levy or collection of any tax under State law . . . .") (emphasis added). For this reason, the ruling in Northwest Airlines would apply only by analogy. We acknowledge, however, that one of the exceptions to the exhaustion of administrative remedies doctrine is "when the administrative body is shown to be biased or has otherwise predetermined the issue before it." McCarthy, 503 U.S. at 148-49. Moreover, in extreme cases of administrative bias, the right to procedural due process might be abridged. Withrow, 421 U.S. at 46-47. These circumstances are not, however, analogous to those in Northwest Airlines. Here, there is no evidence that the Board of Equalization has taken a position contrary to the Plaintiff in pending litigation. Nw. Airlines, 11 F.3d at 72. The ANR Pipeline Co. case has been concluded. The ruling, of course, predated the passage of the amendment found at Tennessee Code Annotated section 67-5-501(9)(B)(iii), which is the central issue in this litigation.

The Plaintiff also points out that certain employees of the Board may have lobbied the General Assembly to pass the amendment. Tenn. Code Ann. § 67-5-501(9)(B)(iii). In rejecting this same argument, federal District Judge Robert L. Echols observed that "an agency's support of a public position on a policy issue does not disqualify the agency on the ground of bias from later acting in its adjudicative role." Colonial Pipeline Co., 231 F.R.D. at 531. We believe that the ruling comports with standards of review–"[a]dministrative decision-makers are presumed to carry out their duties with honesty and integrity." Jones v. Greene, 946 S.W.2d 817, 825 (Tenn. Ct. App. 1996); see also Withrow, 421 U.S. at 47 (stating that there is a "presumption of honesty and integrity in those serving as adjudicators"). That one or more members of the Board has advocated a change in the law does not warrant an exception to the exhaustion requirement.

The Plaintiff also contends that because the Board of Equalization is not insulated from the executive and legislative branches, it is inherently biased. That the Board includes high-ranking members of the executive branch is insufficient, however, to overcome the presumption of honesty and integrity in the administrative adjudicator. Withrow, 421 U.S. at 47. The United States Supreme Court has observed that "'the mere union of the executive power and the judicial power . . . cannot be said to violate due process of law.'" Ward v. Monroeville, 409 U.S. 57, 60 (1972) (quoting Tumey v. Ohio, 273 U.S. 510, 534 (1927)). Further, we have held that "the mere fact that both investigative and adjudicative functions have been granted to an administrative body . . . does not of itself create an unconstitutional risk of bias in an administrative adjudication." Cooper v. Williamson County Bd. of Educ., 803 S.W.2d 200, 202-03 (Tenn. 1990). By its very nature, the Board of Equalization, like other administrative agencies, may perform some functions that might fall within the ambit of all three branches of government.[11] While there are limitations to an

---

[11] Reflecting on the role of administrative agencies within a separation of powers framework, Justice Jackson commented that agencies "have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories much as the concept of a fourth dimension unsettles our three-dimensional thinking." FTC v. Ruberoid Co., 343 U.S. 470, 487 (1952) (Jackson, J., dissenting). He further noted:

> Administrative agencies have been called quasi-legislative, quasi-executive or quasi-judicial, as the
> occasion required, in order to validate their functions within the separation-of-powers scheme of the

(continued...)

-17-

agency's ability to exercise the powers of other branches, see Richardson, 913 S.W.2d at 452, nothing in our case law prohibits an agency from simultaneously taking on quasi-executive and quasi-judicial roles, absent specific allegations of bias or prejudgment. To the contrary, we recognize that some overlap with the executive branch may be necessary to maintain an efficient and responsive bureaucracy. Thus, the argument of inherent bias is without merit.

### III. Declaratory Judgment Against State Officers

An important issue is whether a declaratory judgment may be issued against individual state officers. Relying on its holding in Campbell v. Sundquist, 926 S.W.2d 250 (Tenn. Ct. App. 1995), the Court of Appeals held that the Declaratory Judgment Act authorizes suits against state officers, so long as the goal is not "to reach the state, its treasury, funds or property." Id. at 256. The Plaintiff also relies upon that ruling. The Defendants claim, however, that three opinions from this Court are in conflict with Campbell: L.L. Bean, 817 S.W.2d at 297-98; N. Telecom Inc. v. Taylor, 781 S.W.2d 837, 839-40 (Tenn. 1989); and Hill v. Beeler, 286 S.W.2d 868, 871 (Tenn. 1956). Under the particular facts in each of those cases, we held that suits against state officers should be dismissed because of sovereign immunity and the lack of subject matter jurisdiction. L.L. Bean, 817 S.W.2d at 298-99.

The doctrine of sovereign immunity is "'a principle of the common law as old as the law itself, that the king is not bound by any statute, if he be not expressly named to be so bound.'" Auto. Sales Co. v. Johnson, 122 S.W.2d 453, 455 (Tenn. 1938) (quoting State v. Kinne, 41 N.H. 238 (1860)). In England, some state officers were insulated from suit on the basis that they were acting on behalf of the King. See Louis L. Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 9 (1963). "The King's immunity rested primarily on the structure of the feudal system and secondarily on a fiction that the King could do no wrong." Nevada v. Hall, 440 U.S. 410, 415 (1979) (citing 1 Blackstone, Commentaries *246). Today, American courts generally reject the archaic legal fiction that the sovereign can do no wrong.[12] Seminole Tribe v. Florida, 517 U.S. 44, 103 n.2 (1996) (Souter, J., dissenting) (citing Langford v. United States, 101 U.S. 341, 342-343 (1880)). Justice Holmes attempted to explain modern conceptions of sovereign immunity with the logical conclusion that "there can be no legal right as against the authority that makes the law on which the right depends." Kawananakoa v. Polyblank, 205 U.S. 349, 353 (1907).

---

[11](...continued)
Constitution. The mere retreat to the qualifying "quasi" is implicit with confession that all recognized classifications have broken down, and "quasi" is a smooth cover which we draw over our confusion as we might use a counterpane to conceal a disordered bed.

Id.

[12] A noted scholar of constitutional law and federal courts has generalized the diverging views of sovereign immunity by saying, "Defenders of sovereign immunity say that the doctrine properly puts trust in governments. Critics argue that such trust has no role in constitutional jurisprudence; government at times will violate the law and must be held accountable." Erwin Chemerinsky, Federal Jurisdiction, § 7.2, at 409 (5th ed. 2007).

Logic aside, the policy behind sovereign immunity has been most convincingly justified by principles of separation of powers.[13]

This Court has consistently interpreted our state constitution as upholding the doctrine of sovereign immunity. The last sentence of article I, section 17 states, "Suits may be brought against the State in such manner and in such courts as the Legislature may by law direct."[14] The traditional construction of the clause is that suits cannot be brought against the State unless explicitly authorized by statute. See, e.g., N. British & Mercantile Co. v. Craig, 62 S.W. 155, 157 (Tenn. 1900); State v. Bank of Tenn., 62 Tenn. (3 Baxt.) 395, 403 (1874). The General Assembly has taken a comparable position by stating: "No court in the state shall have any power, jurisdiction, or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds, or property . . . ." Tenn. Code Ann. § 20-13-102 (1994).

This concept of sovereign immunity generally extends to state agencies and state officers acting in their official capacity. 81A Am. Jur. States § 533 (2004). In Stockton v. Morris & Pierce, 110 S.W.2d 480 (Tenn. 1937), however, we held that the doctrine of sovereign immunity does not

_____

[13] With regard to Eleventh Amendment sovereign immunity, one commentator suggests that many of the federal cases dealing with sovereign immunity, intergovernmental tax immunity, and regulatory immunity can be explained "by attention to separation of powers issues implicit in these questions of federalism." Laurence H. Tribe, Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism, 89 Harv. L. Rev. 682, 713 (1976); see also Harold J. Krent, Reconceptualizing Sovereign Immunity, 45 Vanderbilt L. Rev 1529, (1992) (stating that sovereign immunity "derives not from the infallibility of the state but from a desire to maintain a proper balance among the branches of the federal government, and from a proper commitment to majoritarian rule"). The Eleventh Amendment principally addresses separation of powers concerns between the federal and state governments. In a similar fashion, the sovereign immunity doctrine embodied in the Tennessee Constitution addresses separation of powers issues among the three branches of government in Tennessee.

[14] The Supreme Court has recognized a similar restraint on the power of the federal courts to render judgments against the states. The United States Constitution provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. 11. Congress intended this first amendment to the US Constitution since the Bill of Rights to overrule the case of Chisholm v. Georgia, 2 U.S. 419 (1793), which allowed a South Carolina citizen to recover on a war debt for supplying materials to Georgia during the Revolutionary War. The plain language of the Eleventh Amendment, read narrowly, seems to restrict only the power of the federal district courts to hear actions brought against state governments by citizens of another state in diversity actions. See Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 289-90 (1985) (Brennan, J., dissenting). The United States Supreme Court, however, had interpreted this amendment liberally to find a constitutional requirement of state sovereign immunity in federal courts. See, e.g., Hans v. Louisiana, 134 U.S. 1, 14 (1890). Somewhat cryptically, Justice Kennedy has remarked that sovereign immunity is derived not from the Eleventh Amendment, "but from the structure of the original Constitution itself." Alden v. Maine, 527 U.S. 706, 728 (1999). The sovereign immunity we discuss in this case differs from that found in the United States Constitution, which is principally a restraint upon the jurisdiction of the federal courts. We find helpful analogies, however, in much of the reasoning that the federal courts have used when dealing with the practical effects of sovereign immunity.

-19-

bar suits against state officers to prevent them from enforcing an allegedly unconstitutional statute.[15] Stockton involved a suit in replevin instituted by tobacco dealers against the State Department of Finance to recover tobacco products that were seized pursuant to an unconstitutional statute. Id. at 481. The defendants filed a motion to dismiss, alleging that the trial court lacked jurisdiction in actions against the State. Id. In rejecting this argument, we held that "'[a] suit against state officers attacking the constitutionality of a statute of the State is not a suit against the State.'" Id. at 483 (quoting 43 A.L.R. 408). Our reasoning paralleled that of the United States Supreme Court's seminal decision of Ex parte Young, 209 U.S. 123 (1908).[16] Essentially, an officer acting pursuant to an unconstitutional statute does not act under the authority of the state; thus, the officer does not enjoy the immunity that would normally be granted pursuant to official authority. In other words, the officer loses immunity when acting beyond the scope of the power of the State, and the power of the State is limited by the state and federal constitutions. The issue is not whether the State has waived sovereign immunity for this specific classification of suit; sovereign immunity simply does not attach.

The exception we laid out in Stockton pertains only to suits preventing the enforcement of an unconstitutional statute. It would not allow for money damages to be awarded against state officers because such a suit would "reach the state, its treasury, funds, or property." Tenn. Code Ann. § 20-13-102; see also Edelman v. Jordan, 415 U.S. 651, 665 (1974) (holding that suits against state officers for money damages cannot be rendered in federal court because funds to satisfy monetary awards "inevitably come from the general revenues of the state").

Most of the cases relied upon by the Defendants in this case involve suits for money damages, and, therefore, are not controlling. For instance, the plaintiff in Hill was a widow who sued in the Board of Claims for money damages against the State of Tennessee for the death of her husband. Hill, 286 S.W.2d at 870. When the Board of Claims found it lacked jurisdiction, Hill sought a declaratory judgment in the Chancery Court. Id. We affirmed the chancellor's dismissal of the action because the Board of Claims "had no authority or jurisdiction to hear the claimant's petition." Id. at 334-35. Similarly, in Northern Telecom, the plaintiff sought a tax refund from the Commissioner of Revenue because of an alleged overpayment. N. Telecom, 781 S.W.2d at 838-39. In both Hill and Northern Telecom, the Plaintiff sought to disguise a suit for money damages by an action for declaratory judgment–using the Act as a Trojan horse "to reach the state, its treasury, funds, or property." Tenn. Code Ann. § 20-13-102. Despite the broad language in these opinions,

---

[15] Like the doctrine itself, the litigation tactic of naming a state officer in a suit as a means of circumventing sovereign immunity has its roots in English common law. Even though the King could not be sued, there were some instances where "other officials could be sued to remedy the wrongs done by the government." Chemerinsky at 432 (citing John V. Orth, The Judicial Power of the United States: The Eleventh Amendment in American History 41 (1987)).

[16] One federal district court has referred to Ex parte Young as "'one of the three most important decisions the Supreme Court of the United States has ever handed down.'" Allied Artists Pictures Corp. v. Rhodes, 473 F. Supp. 560, 564 (E.D. Ohio 1979) (quoting 17 Wright & Miller, Federal Practice & Procedure § 4231, p. 352 (1978)). It has also been called "one of the cornerstones of our legal system." Id. (citing Great W. United Corp. v. Kidwell, 577 F.2d 1256, 1265 (5th Cir. 1978)).

they should not be interpreted to preclude suits for declaratory judgment against enforcement of unconstitutional statutes by state officers. Stockton, 110 S.W.2d at 483.

The Defendants' reliance on our ruling in L.L. Bean is more on point. In that case, this Court upheld the dismissal of a suit for declaratory judgment where the plaintiff argued that a particular tax statute was unconstitutional. L.L. Bean, 817 S.W.2d at 226. The procedural posture in L.L. Bean is almost identical to the case at bar. In support of the holding, this Court cited both Hill and Northern Telecom and ruled that the Declaratory Judgment Act does not grant subject matter jurisdiction for a court to issue a declaratory judgment against the Commissioner of Revenue. Further, this Court made the following observation:

> Northern Telecom and Hill v. Beeler are not based solely on the doctrine of sovereign immunity. The result in both cases also has as a sufficient basis for decision the lack of subject matter jurisdiction. Even to the extent that they do rely on the doctrine of sovereign immunity, their holdings are not made inapplicable in cases involving state revenue by the device of designating defendants as individuals rather than as state officials.

Id. at 298 (citing Auto. Sales Co., 122 S.W.2d at 453). The L.L. Bean opinion suggests that Colonial's suit is barred for two reasons–sovereign immunity and lack of subject matter jurisdiction. In light of our conflicting opinion in Stockton, we must choose one holding over the other. For several reasons, we believe that Stockton offers the better alternative.

First, the distinction drawn in L.L. Bean, between sovereign immunity and subject matter jurisdiction, was not particularly helpful under the facts of that case or in either Northern Telecom or Hill. While these are two different legal concepts, sovereign immunity and subject matter jurisdiction often embody the same inquiry in cases involving declaratory judgments against enforcement of an unconstitutional statute.[17] This is because sovereign immunity encompasses both the principle of immunity from suit and the principle of immunity from liability. 81A Am. Jur. 2d States § 534 (2004). In accordance with the first principle, "[s]overeign immunity is jurisdictional immunity from suit. The constitutionally guaranteed principle of state immunity acts as a jurisdictional bar to an action against the state by precluding a court from exercising subject-matter jurisdiction." Id. The doctrine of sovereign immunity was the only reason that the courts lacked subject matter jurisdiction in Hill and Northern Telecom. When state officers lose this immunity by enforcing an unconstitutional statute, the Declaratory Judgment Act grants jurisdiction in a suit against them as individuals. Stockton, 110 S.W.2d at 482-83. Absent the shield of sovereign immunity, a suit against a state officer is no different than a suit against any other person for the purposes of subject matter jurisdiction.

---

[17] This case does not deal with waiver of sovereign immunity by statute, but even when the issue is one of waiver, subject matter jurisdiction and sovereign immunity present essentially the same issue. An enabling statute that grants a court subject matter jurisdiction to hear claims against a state will likewise constitute an explicit legislative waiver of sovereign immunity.

Next, the L.L. Bean opinion did not apply, distinguish, or explicitly overrule Stockton. In Stockton, we affirmed a judgment against the Commissioner of Finance and Taxation. Stockton, 110 S.W.2d at 485-86. Confronted with these conflicting holdings, it appears that our ruling today is not only compliant with a well-established rule of sovereign immunity as recognized by the federal courts, Ex parte Young, 209 U.S. at 159-60, but is also consistent with the majority view in other jurisdictions which recognize traditional sovereign immunity. See, e.g., Jackson v. Millstone, 801 A.2d 1034, 1043 (Md. 2002) ("Where a statute or regulation is invalid, sovereign immunity does not preclude a declaratory judgment action or suit for an injunction against the governmental official who is responsible for enforcing the statute or regulation."); City of Belmont v. Miss. State Tax Comm'n, 860 So. 2d 289, 296 (Miss. 2003) (quoting State v. Hinds County Bd. of Sup'rs, 635 So. 2d 839, 842 (Miss. 1994) ("Mississippi law supports the proposition that no sovereign immunity exists when the relief sought is a declaration that a particular statute or action of the State is unconstitutional."); Northwall v. State, 637 N.W.2d 890, 896 (Neb. 2002) (stating that "a declaratory judgment action attacking the constitutionality of a statute or seeking relief from an invalid act or an abuse of authority by an officer or agent is not a suit against the state and is therefore not prohibited by principles governing sovereign immunity"); Tex. Natural Res. Conservation Comm'n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002) ("Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority."); Berlowitz v. Roach, 30 N.W.2d 256, 257 (Wis. 1947) (stating these are but actions "against the enforcing officer to prevent him from doing that which it is claimed he has no legal right to do").

The ruling in Stockton is based upon the concept that an officer acting pursuant to a statute that is unconstitutional and void does not act as an agent of the State. Any such action is *ultra vires*–that is, beyond the authority granted by the State. As Justice Peckham wrote:

> The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the State, to enforce a legislative enactment which is void because unconstitutional.

Ex parte Young, 209 U.S. at 159.[18] We agree with the assessment made by our highest court more than a century ago. Further, the approach in Stockton is most consistent with our separation of powers doctrine in that it prevents sovereign immunity from devitalizing a judicial tool necessary to ensure that the executive and legislative branches act within the constraints of the state and federal constitution.[19] Tenn. Const. art. II, § 2; see also Campbell, 926 S.W.2d at 266.

---

[18] Professor Charles Alan Wright referred to this approach as "indispensable to the establishment of constitutional government and the rule of law." Charles Alan Wright, Law of Federal Courts 292 (4th ed. 1983).

[19] As James Madison wrote,

(continued...)

While in Campbell v. Sundquist, the Court of Appeals analyzed the doctrine of sovereign immunity under the Declaratory Judgment Act in a slightly different way, the result is consistent with our ruling today. In Campbell, our intermediate court reasoned that because the Declaratory Judgment Act "should be liberally construed in favor of the person seeking relief in a proper case to the end that rights and interests be expeditiously determined;" the Act was "an enabling statute to allow a proper plaintiff to maintain a suit against the State challenging the constitutionality of a state statute." Id. at 256-57. Stated differently, the remedial nature of the Act qualified as a waiver of sovereign immunity. The flaw in that reasoning, however, is that the waiver of sovereign immunity must be explicit, not implicit. See Auto. Sales Co., 122 S.W.2d at 456 (quoting Mayrhofer v. Bd. of Educ., 26 P. 646, 647 (Cal. 1891) ("One cannot sue the state, unless expressly authorized by statute, and this principle is embodied in our constitution. General statutes creating new remedies for individuals have never been held to authorize such suits.")). The Declaratory Judgment Act does not contain an explicit waiver of sovereign immunity.

Unlike the majority in Campbell, we do not hold that the Declaratory Judgment Act waives sovereign immunity. Instead, we hold that sovereign immunity simply does not apply to a declaratory judgment action challenging the constitutionality of a statute against state officers. See Stockton, 110 S.W.2d at 483. Because sovereign immunity does not apply, a waiver is unnecessary. Further, subject matter jurisdiction is not a bar. Because this case is a declaratory judgment action against state officers challenging their authority to impose laws violative of the constitution in their individual capacity, as opposed to official capacity, the Defendants fall under the definition of "person" in our Declaratory Judgment Act. Tenn. Code Ann. § 29-14-101 (providing that a "person" is "any person, partnership, joint stock company, unincorporated association, or society, or municipal or other corporation of any character whatsoever"). Thus, the General Assembly has authorized subject matter jurisdiction over these individual state officers, to the extent that their actions are grounded in an unconstitutional statute. This grant of subject matter jurisdiction is found in Tennessee Code Annotated section 29-14-103, which provides that "[a]ny person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder."

It is our view, therefore, that the Declaratory Judgment Act grants subject matter jurisdiction to the Davidson County Chancery Court to address the constitutional issues. As stated, the Plaintiff does not seek money damages or a refund of paid taxes; the relief sought is a declaration of unconstitutionality. Thus, the Chancery Court may issue declaratory and injunctive relief against the Defendants in their individual capacity, so long as the court's judgment is tailored to prevent the

---

[19](...continued)

No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than that which the objection is founded. The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny.

The Federalist No 48 (James Madison).

-23-

implementation of unconstitutional legislation and does not "reach the state, its treasury, funds, or property."  Tenn. Code Ann. § 20-13-102.

## Conclusion

When challenging the facial validity of a statute on constitutional grounds, a plaintiff need not exhaust administrative remedies under the Uniform Administrative Procedures Act prior to a suit for declaratory judgment.  Further, sovereign immunity does not bar a declaratory judgment or injunctive relief against state officers to prevent the enforcement of an unconstitutional statute, so long as the plaintiff does not seek monetary damages.  For these reasons, we affirm the judgment of the Court of Appeals and remand this case to the Chancery Court for proceedings consistent with this opinion.  Costs are assessed to the Defendants.

_____
GARY R. WADE, JUSTICE