IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 23, 2014 Session

## DENNIS WADE SUTTLES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 72245    Mary Beth Leibowitz, Judge**

_____

**No. E2013-01016-CCA-R3-PD - Filed June 25, 2014**

_____

The petitioner, Dennis Wade Suttles, appeals from the trial court's denial of his petition in which he sought relief from his death sentence, claiming that he was intellectually disabled. On appeal, the petitioner contends that the trial court erred in denying (1) his petition for writ of error coram nobis, (2) his motion for a declaratory judgment, and (3) his stand-alone claim under the intellectual disability provisions in Tennessee Code Annotated section 39-13-203. Upon reviewing the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROGER A. PAGE, JJ., joined.

Daniel E. Kirsch, Nashville, Tennessee, for the appellant, Dennis Wade Suttles.

Robert E. Cooper, Jr., Attorney General & Reporter; Brent C. Cherry, Senior Counsel; Randall E. Nichols, District Attorney General; and Leland L. Price, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**TRIAL PROCEEDINGS**

On March 13, 1996, the petitioner killed his estranged girlfriend, Gail Rhodes, in the presence of her daughter and her daughter's friend in the parking lot of a Taco Bell in Knoxville, Tennessee. In November 1997, the petitioner was convicted of first degree premeditated murder and sentenced to death. The jury found two aggravating circumstances:

(1) the petitioner was previously convicted of one or more violent felonies and (2) the murder was especially heinous, atrocious, or cruel. See Tenn. Code Ann. § 39-13-204(i)(2), (5). The Tennessee Supreme Court affirmed the petitioner's conviction and death sentence on direct appeal. See State v. Suttles, 30 S.W.3d 252, 255 (Tenn. 2000).

The evidence presented at trial was summarized by the Tennessee Supreme Court on direct appeal as follows:

> The proof introduced at the guilt phase of the trial showed that the defendant and the victim met and began dating in April of 1995. The relationship progressed, and in October 1995 the defendant asked the victim to marry him. The victim's divorce was not final at that time, so the engagement was delayed. In December 1995, the defendant purchased a house, and the defendant, the victim, and her fifteen-year-old daughter, Christina, moved into the house together. At Christmas, the defendant gave the victim an engagement ring.

> However, in February 1996, the victim moved out of the defendant's house after the two argued. Around the time of this argument, the victim's co-workers had noticed deep bruises on the victim's neck that looked like fingerprints. In his testimony, the defendant admitted that during the argument he tried to take the engagement ring from the victim's finger and broke the victim's necklace.

> The defendant was distraught at the breakup of the relationship. He repeatedly sought to convince the victim to return to him. He called her repeatedly at work, sometimes waited for her at work, left cards on the windshield of her car, and attempted to speak with her whenever he saw her in public.

> The victim appeared afraid of the defendant and tried to avoid him. She did not speak with him on the telephone when he called, and the victim's co-workers escorted her to her vehicle in the evening. In addition, the victim kept secret the location of her new residence and carried important personal papers, such as a deed to her burial plot, in her purse so that the papers could be easily located should something happen to her. The victim knew that in 1986, the defendant had pled guilty to one count of felonious assault with bodily injury and three counts of assault with intent to commit first degree murder. She also knew that these convictions arose out of an incident where the defendant attempted to force his estranged former wife and his

-2-

three-year-old son to return home with him. When his former father-in-law intervened, the defendant shot him. The defendant also assaulted a police officer who tried to apprehend him during this episode. The victim knew the circumstances of the previous convictions because she had accompanied the defendant on his monthly visit to his parole office on October 3, 1995. The parole officer told the victim the circumstances of the offenses and advised her to call if "anything unusual occurred."

On March 13, 1996, about one month after the break-up, the defendant, who was a foreman for a roofing company, worked his regular job. His co-workers testified that he was not angry or upset that day, did not make threatening remarks about the victim, and seemed his usual self. As he was driving home from work, he saw the victim drive by in her car with her daughter and her daughter's friend, Arlisa Tipton, but he lost her car when she drove into a residential neighborhood. The defendant then drove to his mother's house, where he was invited to eat supper. He accepted the invitation but decided that he would go to his own home first and shower and change clothes before supper. The defendant left his mother's home around 5:30 p.m., and he did not appear angry or upset at the time he left, nor did he say anything about the victim. The defendant's step-father operated a small engine repair shop and had repaired the motor in a piece of equipment, a leaf blower, that the defendant used on his roofing jobs. The defendant loaded the leaf blower in his car when he left his mother's home and said that he intended to use it on his roofing job the next day.

In the meantime, the victim, who had been aware that the defendant was following her and had deliberately eluded him, drove to a nearby Taco Bell restaurant to eat with Christina and Arlisa. According to Christina, the victim parked her car in the back of the restaurant so the defendant would not see the car if he drove past the front of the restaurant on Chapman Highway.

Unfortunately, on the way to his home, the defendant stopped at Wal-Mart on Chapman Highway which is located in the same shopping mall area as the Taco Bell where the victim was eating with Christina and Arlisa. The defendant intended to purchase some roofing supplies. The defendant was unable to find the products he needed, so he left Wal-Mart. As he was driving away from Wal-Mart toward Chapman Highway, he drove past the back of the Taco Bell and pulled into the restaurant when he noticed the victim's car. Parking his automobile beside the victim's vehicle, the defendant went inside the restaurant and attempted to speak with the victim. The two argued, and the

defendant followed the victim and the girls outside.

The argument continued as the victim and the defendant stood beside the victim's automobile. Finally, the defendant grabbed the victim to prevent her from getting into her car. Placing one arm around the victim's neck, the defendant held a lock blade pocket knife to her throat. When Christina approached, the defendant said, "Get back or I'll kill her." Christina stepped back, and the victim told the defendant to put the knife away and she would go with him. The defendant put the knife in his pocket, apologized, and released the victim. When the victim fled toward the restaurant, the defendant followed, tackled the victim, pulled out his knife, slashed her throat and stabbed her multiple times. Christina, who witnessed the attack on her mother, testified:

> He cut her on her neck. He slit her neck all to pieces. And he stabbed her in the face and cut her lip and he cut her hair and he cut her body; he stabbed her. And I saw him flip her over and he stabbed her in the back. And that's all he–
>
> ***
>
> I was about three feet back because she kept telling me to get back and she kept screaming.

When he was finished, the defendant arose, wiped off his knife, returned it to his pocket, nonchalantly got into his car, and drove away. Christina testified that the defendant smiled at her as he drove by.

Amanda Reagan, an employee of Taco Bell, and Shawn Patrick Kane, a man who had just left the grocery store across the parking lot from Taco Bell, also witnessed the stabbing. According to these witnesses, after stabbing the victim, the defendant nonchalantly got into his car and drove away as if nothing of any great import had occurred. Both of these witnesses noticed the defendant's license plate number and gave it to police.

While they waited for an ambulance, Reagan, Kane, and an unidentified nurse, tried to help the victim as she lay helpless and bleeding in the parking lot. Attempting to stop or slow the bleeding, they applied pressure using towel and napkin compresses. The victim complained of choking and, when she tried to move, witnesses testified that the wound on her neck gaped open and

she started gurgling blood. Although Kane did not hear her say anything further after she complained of choking, he said she was still trying to move when she was being loaded into the ambulance. Reagan testified that as she was holding the stretcher while the victim was being loaded onto the ambulance, she heard the victim call out her daughter's name and saw the victim stretch out her hand as she was placed in the ambulance. The victim arrived by ambulance at the hospital at 6:26 p.m. and was pronounced dead at 6:35 p.m.

Around 7 p.m., the defendant called a friend, Donna Rochat. He told Rochat that he thought he had killed the victim after an argument in the parking lot of the Taco Bell. The defendant told Rochat that he had stabbed the victim in the back, cut her throat, and stabbed her in the chest. Rochat advised the defendant to surrender to police, but he said he could not do that. Rochat said the defendant seemed calm, but he commented that he would kill himself if he had a gun. The defendant also called his mother at some point after the stabbing and asked her to drive to the Taco Bell and determine if he had killed the victim.

Later that same evening, the police arrested the defendant as he approached his house on foot. The defendant had parked his car at a church parking lot about one mile from his home. The police described the defendant as cooperative and unemotional at the time he was apprehended. A knife with a wooden handle and approximately a three inch blade was found in the defendant's pocket at the time of his arrest.

Dr. Sandra K. Elkins, the Knox County Medical Examiner and a forensic pathologist, testified that the victim had suffered twelve major wounds inflicted with a sharp instrument such as a knife. These wounds included three stab wounds to the left side of her neck, a large gaping slash wound to the right neck, one stab wound just beneath her left breast, one stab wound to her left front shoulder, six stab wounds in her back. The victim also sustained an incise wound to the left side of her lips, defensive wounds to both hands and her right wrist, and superficial wounds underneath her chin. Dr. Elkins opined that the cause of death was multiple knife stab wounds. The immediate cause of death according to Dr. Elkins was bleeding from the jugular vein and external carotid artery, which were cut by the slash wound to the right neck. The other major wounds would have also potentially caused death given enough time and no medical treatment. Dr. Elkins also opined that the victim was alive when the wounds were inflicted, that she remained able

to speak, because the injury to her larynx from the slash wound to the right side of her neck did not damage her vocal cords, that she would have fallen unconscious in about five to six minutes, and that she would have bled to death within ten minutes as a result of the slash wound to the right side of her neck. However, Dr. Elkins opined that application of pressure to the wound on the right side of the victim's neck may have extended consciousness and delayed the time of death by five minutes.

The defendant testified at trial. According to the defendant, while he and the victim were talking beside her car, the victim told him that, if he did not stay away, she would have him killed. He then grabbed her and told her not to threaten him. While admitting that he put a knife to the victim's throat, he denied that he intended to hurt her and claimed that he was only reacting to the victim's threat. The defendant testified that, when he released the victim and apologized, she told him he was a dead man. The defendant testified he did not remember anything that happened after the victim threatened him the second time. He claimed that he did not regain his memory until weeks after the murder.

During the defendant's testimony it was revealed that he had previously pled guilty to one count of felonious assault with bodily injury and three counts of assault with intent to commit first degree murder. As previously stated, the victims of these offenses were his former father-in-law, his ex-wife, his three-year-old son, and a police officer who was attempting to apprehend him. The offenses occurred when the defendant tried to force his former wife, who had left him, to return home. The victim was aware of the defendant's prior convictions.

The defendant's stepfather testified that during the years that he had known the defendant he had never seen him angry or upset, and he described the defendant as a calm and easygoing person. Dr. Jerry Matthews, a clinical psychologist who had evaluated the defendant on three separate occasions, in 1991 and 1993 for the Tennessee Board of Paroles and in 1996 for the defense, testified about the defendant's mental condition. According to the history related to Dr. Matthews, the defendant had been a "blue baby" when he was born. His older brother died of suffocation at the age of five. His father left the family when the defendant was four, and the defendant was raised by his paternal grandparents, who were strict, religious people. The defendant dropped out of school in the tenth grade and went to work. His one marriage lasted twelve years and produced one child.

In 1991, Dr. Matthews concluded that the defendant presented a substantial risk of violent behavior if released on parole, particularly if he was involved in a heterosexual relationship. Dr. Matthews described the defendant as someone who acts impulsively, without thought or reflection, and who, frightened of being alone, becomes anxious and potentially violent when unable to control his environment. According to Dr. Matthews the defendant's behavior was attributable to the oxygen deprivation he suffered as a "blue baby" and to his abandonment as a child. Between 1991 and 1993, the defendant attended anger management classes in prison. He was released on parole in 1994.

Dr. Matthews opined that at the time of the homicide the defendant was in a state of heightened emotional arousal, that he put the knife to the victim's throat to convince her to come back to him, and that he released her when she reassured him. Accepting the defendant's version of the offense, Dr. Matthews said that the victim's threat to have the defendant killed was "the straw that broke the camel's back." Dr. Matthews opined that the killing was not premeditated and was instead "an impulsive and explosive act of violence" caused by "basic, primitive emotions of anger and fear and hurt, all mixed together."

In rebuttal, the State recalled Christina who testified that her mother did not threaten the defendant, as he had claimed, before he stabbed her.

Based upon this proof, the jury found the defendant guilty of premeditated first degree murder. At the sentencing phase, the State relied upon the proof presented at the guilt phase, and also offered into evidence the indictments and judgments from the defendant's four previous convictions for assault. These showed that on January 6, 1986, in Sevier County, Tennessee, the defendant pleaded guilty to one count of felonious assault with bodily injury and enhancement for use of a firearm (sentence 30 years plus 5 years for enhancement) and to three counts of assault with intent to commit first degree murder by use of a firearm (three 5-year concurrent sentences).

The defendant presented records from his earlier imprisonment in the Department of Correction to show that he had been a model inmate. For example, these records showed that at the time of his parole he received recommendations from twenty-nine staff members at the correctional center and that the warden and associate warden recommended parole. He worked during his entire imprisonment, was not violent and reached "trusty" status.

During his incarceration, the defendant received two write-ups: one for having contraband (tools) in his cell and the other for violating policy and procedures by possessing a fan from which the name and inmate number had been scrubbed.

The defendant's mother, Lois Evelyn Napier, testified that the defendant was born breach and was a "blue baby." After the defendant's father left, the defendant lived with his paternal grandparents because his mother was working two jobs and could not care for him. The defendant was not involved in any trouble as a child. During his imprisonment, Mrs. Napier visited her son weekly. After his release on parole, he lived with his mother and her husband and caused no trouble. The defendant called his mother on the night of the murder and asked if she would go to the Taco Bell to see if the victim was alive. Ms. Napier testified that she loved her son very much and wanted to help him. The defendant was forty-four years old at the time of the murder.

Id. at 255-59.

## POST-CONVICTION PROCEEDINGS

In March 2001, the petitioner filed a pro se petition for post-conviction relief. In his amended petition, filed in January 2002, the petitioner contended that he was intellectually disabled and ineligible for the death penalty. He further contended that trial counsel were ineffective in failing to allege intellectual disability based upon the petitioner's I.Q. score of 69 on the Beta-II I.Q. test in both 1984 and 1991.

In November 2005, the petitioner filed a second amended petition in which he alleged that trial counsel were ineffective in failing to present evidence of his "intellectual deficits." The petitioner noted his I.Q. scores in 1984 and 1991 and stated that the scores demonstrated that he was "in the [intellectually disabled] range." The petitioner raised a claim which he titled an "Atkins-Roper Claim." He asserted that because his "mental age, i.e., an individual's absolute level of performance, is below the threshold established by Roper [v. Simmons, 543 U.S. 551 (2005),] and Atkins [v. Virginia, 536 U.S. 304 (2002)], his execution would violate Article I, §§ 8 and 16 of the Tennessee Constitution and the Eighth and Fourteenth Amendments to the United States Constitution." The petitioner cited to Atkins, Roper, and Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001), and asserted that due to his "intellectual and emotional problems, his cognitive and psychological functioning, i.e. his . . . mental age, is below 18 years."

During the August 2007 post-conviction hearing, the petitioner presented the testimony of Dr. Pamela Auble, a clinical neuropsychologist who evaluated him in June 2003. According to Dr. Auble's report, she reviewed prior psychological evaluations, prior testimony, summaries of interviews with the petitioner and his family, medical records, school records, and prison records. Dr. Auble interviewed the petitioner and performed standardized testing. She also reviewed testing of the petitioner by Dr. Michael Tramontana in 2001.

Dr. Auble testified that while in prison in 1986, the petitioner received an I.Q. score of 69 on the Beta I.Q. test, a screening test. In March of 1996, the petitioner received an I.Q. score of 78 on the Beta test. Dr. Auble said the I.Q. score of 78 was consistent with her evaluation. She stated that in 2001, Dr. Tramontana administered the Wechsler Adult Intelligence Scale-III (WAIS-III), the "gold standard" I.Q. test. The petitioner received a full-scale I.Q. score of 77, a verbal I.Q. score of 77, and a performance I.Q. score of 81. Dr. Auble noted in her report that the results obtained by both her and Dr. Tramontana were considered to be valid and that the petitioner received perfect scores on malingering tests. Dr. Auble stated that the results of the I.Q. in 2001 were within one point of the petitioner's estimated I.Q. in 1996, were "very consistent," and were "further evidence that he's not faking or malingering."

Dr. Auble stated in her report that the petitioner's intelligence was in the borderline range. She testified that she did not believe that the Petitioner met the standard for intellectual disability set forth in Tennessee's statute. Dr. Auble said that an I.Q. of 70 or below with some error of measurement is generally considered to be in the intellectually disabled range. She explained that as a result, a person with an I.Q. score of 73 or 75 can be considered to be intellectually disabled if the person has deficits in adaptive behavior. She stated that the Tennessee statute set out a specific definition for intellectual disability that has been interpreted to require an I.Q. "cut-off" of 70.

The petitioner also presented the testimony of Dr. Peter Brown, a psychiatrist, who evaluated the petitioner. Dr. Brown interviewed the petitioner for a total of five hours and considered Dr. Auble's report and much of the same categories of information relied upon by Dr. Auble. In explaining the petitioner's cognitive functioning in his report, Dr. Brown stated that he estimated the petitioner's I.Q. "as in the range borderline [intellectually disabled] to low average." Dr. Brown testified at the hearing that the petitioner's I.Q. was within the borderline range. He further testified that the petitioner's "mental age" fell within a seven- to nine-year-old level of functioning.

In its order denying post-conviction relief, the post-conviction court noted that Tennessee law does not refer to "mental age" but to intellectual disability. As a result, the

post-conviction court addressed the issue as set forth in the statute. The post-conviction court found as follows:

> In this case, the petitioner presented proof of only one beta 2 I.Q. score in prison which was below 70. The petitioner was in his thirties at the time he took the I.Q. test in prison. Therefore, the proof submitted did not establish that the petitioner's "alleged" [intellectual disability] manifested itself before the age of 18 as required by the statute and the case law. . . .
>
> In addition, the evidence presented both at trial and at the post-conviction hearing established that the petitioner began working at a young age, has always worked, could maintain a household, and even held a supervisory job with additional responsibilities. The experts, counsel, and petitioner's own extended family testified that he was not [intellectually disabled]. [Trial counsel] discussed the numerous adaptive behaviors that the petitioner exhibited which showed no sufficient deficit as required by the statute. One of his elementary school teachers testified that he was a fair student and that he was clean, neat, and liked books. This testimony was consistent with statements from the family about the way the petitioner kept his things, his car, and his home later.
>
> Based upon all the proof, this claim also does not support any claim of a deficit in adaptive behavior as required by the statute. Accordingly, the petitioner would not be entitled to relief on this issue.

The petitioner did not raise on appeal an independent claim challenging his eligibility for the death penalty due to intellectual disability or "mental age." This court affirmed the post-conviction court's judgment denying post-conviction relief. See Dennis Wade Suttles v. State, No. E2008-02146-CCA-R3-PD, 2011 WL 1642640 (Tenn. Crim. App. Apr. 29, 2011), perm. app. denied (Tenn. Nov. 16, 2011).

## INTELLECTUAL DISABILITY PROCEEDINGS

On April 9, 2012, the petitioner filed a motion to reopen post-conviction proceedings, alleging that he is intellectually disabled and, therefore, ineligible for the death penalty. The petitioner contended that the Tennessee Supreme Court's decision in Coleman v. State, 341 S.W.3d 221 (Tenn. 2011), established a new constitutional right that was not recognized at the time of his trial. He further contended that he had new scientific evidence that he is intellectually disabled and, thus, actually innocent of capital murder and the death penalty.

-10-

The petitioner attached to his motion the April 5, 2012 affidavit of Dr. Auble. Dr. Auble reviewed a number of the petitioner's records and the transcript of testimony from witnesses during the post-conviction hearing. She stated that at the time, Tennessee law required a raw I.Q. test score of 70 or below to establish intellectual disability. She further stated that because the petitioner's raw I.Q. test score on the WAIS-III was 77, she believed that intellectual disability could not be considered under the Tennessee statute at that time. Following the release of Coleman, Dr. Auble "re-analyzed the information [she] had available from 2005 and supplemented it with additional information that [she] obtained regarding [the petitioner] on intelligence and adaptive deficits."

Dr. Auble noted that the petitioner was administered the WAIS-III on August 28, 2001, and received a full-scale I.Q. score of 77. Dr. Auble did not administer I.Q. testing to the petitioner during her prior evaluation in 2003 but relied upon the previous test score. She adjusted the score downward 1.8 points due to the Flynn Effect and 2.34 points due to inflation of I.Q. scores on the WAIS-III. The adjustments resulted in an I.Q. score of 72.86. Dr. Auble considered the five-point measurement error for a Wechsler I.Q. score. She noted that test scores generally are reported within a range and that there is a 95% probability that the true intelligence test score would fall within that range. The 95% confidence interval for a score of 72 would be from 68-77, and the interval for a score of 73 would be from 69-78.

On March 12, 2012, Dr. Auble administered the WAIS-IV to the petitioner, who obtained a full-scale score of 71. Dr. Auble adjusted the score downward by 1.8 points based upon the Flynn Effect, resulting in an adjusted score of 69.2. She stated that the petitioner obtained a perfect score on two critical trials of the Test of Memory Malingering, indicating that he was putting forth adequate effort on the testing. Dr. Auble concluded that

> [b]ecause of the difficulties with the normative sample for the WAIS-III, because the WAIS-III was administered by a technician with an unknown amount of experience and training, and because no reliable effort testing was conducted in 2001, the 2012 adjusted IQ test score of 69.2 is seen as more valid and reliable than the adjusted 2001 IQ test score of 72.86.

Dr. Auble found that the score of 69.2 was consistent with significant deficits on tasks measuring intellectual functioning present in her prior neuropsychological testing of the petitioner. As a result, Dr. Auble opined that the petitioner has significantly subaverage general intellectual functioning as evidenced by an I.Q. of 69.2 and that he meets that standard set forth in the first prong of intellectual disability in the Tennessee statute.

Dr. Auble stated that she did not conduct a formal evaluation of adaptive behavior deficits in her prior evaluation but has since conducted an analysis. In doing so, she

considered the information in her 2005 report, Dr. Brown's 2005 report, and other background material that she had at that time. On March 12, 2012, Dr. Auble administered the Independent Living Scale, a test of adaptive behavior functioning, to the petitioner. Dr. Auble determined that the petitioner had significant deficits in social/interpersonal skills, self-direction, functional academic skills, and health/safety under the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR). Under the American Association of Intellectual and Developmental Disabilities (AAIDD) criteria, Dr. Auble found that the petitioner had significant deficits in the conceptual and social domains of adaptive behavior.

Dr. Auble concluded that the onset of the petitioner's significantly subaverage intellectual functioning and deficits in adaptive behavior occurred prior to the age of eighteen. As a result, she opined that the petitioner is intellectually disabled.

The petitioner supplemented his motion to reopen with the April 25, 2012 affidavit of Dr. Brown. Dr. Brown stated that he evaluated the petitioner in 2005 and found that the petitioner functioned at a borderline intellectually disabled level and that the petitioner had done so since childhood. Dr. Brown explained that at that time, he understood that Tennessee law precluded a diagnosis of intellectual disability if the defendant's raw I.Q. score was higher than 70. Following Coleman, the petitioner's counsel requested that Dr. Brown assess Dr. Auble's conclusion that under Coleman, the petitioner was intellectually disabled at the time of the offense. Dr. Brown noted that his previous findings were consistent with an intellectual disability diagnosis at the time of the offense and that "the more recent scientific evidence" outlined in Dr. Auble's affidavit confirmed his previous conclusions. As a result, Dr. Brown concurred with Dr. Auble's conclusion that the petitioner was intellectually disabled at the time of the offense.

Dr. Brown stated that at the time of his evaluation in 2005, the results of neuropsychological testing measuring the petitioner's ability to function led him to conclude that the petitioner's I.Q. test score of 77 on the WAIS-III overestimated his functional ability. Dr. Brown further stated that his finding regarding the petitioner's functional I.Q. was consistent with evidence of the petitioner's actual impaired functioning and his descriptions of his life experiences. Dr. Brown noted that in 2005, he further concluded that the petitioner's school records and other evidence of his level of functioning showed that his impairment began "early in life." Finally, Dr. Brown noted that his "findings at the time of [his] evaluation were consistent with each prong of [an intellectual disability] diagnosis. However, because [the petitioner's] raw IQ score was higher than 70, [Dr. Brown] was unable to reach a diagnosis of [intellectual disability] under Tennessee law as [he] understood it at the time."

-12-

On December 20, 2012, the Tennessee Supreme Court released its opinion in <u>Keen v. State</u>, 398 S.W.3d 594 (Tenn. 2012), in which the court rejected the bases upon which the petitioner sought to reopen his post-conviction proceedings. On January 23, 2013, the petitioner amended his motion to include a petition for writ of error coram nobis, a motion for declaratory judgment, and an independent claim for relief under Tennessee's intellectual disability statute. The State filed a response seeking summary dismissal.

Based upon the pleadings, the trial court entered an order denying relief. The trial court found that the petitioner's motion to reopen post-conviction proceedings was precluded by <u>Keen</u>. The trial court further found that the issue of intellectual disability was previously determined during the initial post-conviction proceedings. The court noted that the post-conviction court thoroughly considered the issue and found that the evidence presented during the hearing did not establish that the petitioner is intellectually disabled. The trial court further noted that the post-conviction court found that the petitioner failed to establish both the intelligence prong and the deficits in adaptive behavior prong.

With regard to the petitioner's petition for a writ of error coram nobis, the trial court found that the affidavits of Dr. Auble and Dr. Brown were cumulative to the evidence previously presented at the post-conviction hearing. The trial court further found that the affidavits related to the credibility of prior evidence on a previously determined issue and did not qualify as "new evidence." The trial court determined that the petition was barred by the statute of limitations and that due process did not require tolling. The court noted that the information related to the issue of intellectual disability had been available to the petitioner for many years but that the petitioner did not file the petition until almost fourteen years after the judgment became final. The court determined that "[m]erely having an expert perform yet another evaluation like others had done in the past does not satisfy the criteria for tolling the statute."

The trial court found that the intellectual disability provisions in Tennessee Code Annotated section 39-13-203 do not provide an independent avenue for raising the issue of intellectual disability post-trial. Finally, the trial court concluded that the petitioner failed to establish a basis for declaratory relief.

## ANALYSIS

The petitioner contends that the post-conviction court erred in denying his petition for error coram nobis and his motion for a declaratory judgment. He also contends that he should be allowed to directly invoke the provisions of Tennessee Code Annotated section 39-13-203 to establish that he is intellectually disabled.

## A. Intellectual Disability and the Death Penalty

In 1990, Tennessee Code Annotated section 39-13-203 was enacted prohibiting the execution of defendants who were intellectually disabled at the time that they committed first degree murder. See Tenn. Code Ann. § 39-13-203(b); State v. Howell, 151 S.W.3d 450, 455 (Tenn. 2004); Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001). Although the statute is not to be applied retroactively, the execution of intellectually disabled individuals violates constitutional prohibitions against cruel and unusual punishment. Howell, 151 S.W.3d at 455 (citing Van Tran, 66 S.W.3d at 798-99); see Atkins, 536 U.S. at 321.

In Tennessee, "intellectual disability" rendering a defendant ineligible for the death penalty requires:

> (1) Significantly subaverage general intellectual functioning as evidenced by
> a functional intelligent quotient (I.Q.) of seventy (70) or below;

> (2) Deficits in adaptive behavior; and

> (3) The intellectual disability must have manifested during the developmental
> period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a). All three prongs must be satisfied to establish intellectual disability.

The defendant has the burden of establishing intellectual disability by a preponderance of the evidence. See Tenn. Code Ann. § 39-13-203(c); Howell, 151 S.W.3d at 465. The issue of whether a defendant is intellectually disabled and, thus, ineligible for the death penalty is a mixed question of law and fact. State v. Strode, 232 S.W.3d 1, 8 (Tenn. 2007). A trial court's findings of fact are binding on this court unless the evidence preponderates against those findings. Id. The trial court's application of the law to those facts is reviewed de novo. Id.

The first prong of intellectual disability under section 39-13-203(a)(1) requires "[s]ignificantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below." In applying this provision, the Tennessee Supreme Court held in Howell that the demarcation of an I.Q. of 70 is a "bright-line" rule that must be met. 151 S.W.3d at 456-59. Following Howell, the Tennessee Supreme Court released its opinion in Coleman v. State, 341 S.W.3d 221, 241 (Tenn. 2011), holding that although an individual's I.Q. is generally obtained through standardized intelligence tests, section 39-13-203 does not provide clear direction regarding

-14-

how an I.Q. should be determined and does not specify any particular test or testing method that should be utilized. The court noted that section 39-13-203(a)(1) requires a "functional intelligence quotient of seventy (70) or below" and does not require a "functional intelligence quotient *test score* of seventy (70) or below." Coleman, 341 S.W.3d at 241 (emphasis in original). Therefore, "the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." Id.

The supreme court noted that section 39-13-203(a)(1) differs with clinical practice in one material respect. Id. at 247. In diagnosing intellectual disability, clinicians generally report their conclusions regarding an individual's I.Q. within a range, and section 39-13-203(a)(1) requires more definite testimony. Id. As a result, "an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is 'seventy (70) or below' or is above 70)." Id. at 242.

In determining whether a defendant's functional I.Q. is 70 or below, "a trial court should consider all evidence that is admissible under the rules for expert testimony." Keen, 398 S.W.3d at 605. Experts may use relevant and reliable practices, methods, standards, and data in formulating their opinions. Coleman, 341 S.W.3d at 242. Moreover,

> if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.

Id. at n.55. The emphasis to be placed upon clinical judgment varies depending upon "the type and amount of information available, the complexity of the issue, and the presence of one or more challenging conditions or situations." Id. at 246. The trial court is not required to follow any particular expert's opinion but must fully and fairly consider all evidence presented, including the results of all I.Q. tests administered to the defendant. Id. at 242.

Following Coleman, the Tennessee Supreme Court released its opinion in Keen v. State, 398 S.W.3d 594 (Tenn. 2012), addressing the issue of whether a capital petitioner may allege intellectual disability as a basis for reopening post-conviction proceedings. The petitioner in Keen sought to reopen post-conviction proceedings on the ground that he possessed new scientific evidence of actual innocence. Keen, 398 S.W.3d at 598. The

evidence consisted of a newly-obtained I.Q. score of 67, which the petitioner claimed established that he was intellectually disabled and, therefore, "actually innocent" of the death penalty. Id. The petitioner also asserted that Coleman established a new rule of constitutional criminal law that required retroactive application. Id. at 599. The Tennessee Supreme Court rejected both of the bases upon which the petitioner sought to reopen post-conviction proceedings. The court specifically held that Coleman addressed the interpretation and application of Tennessee Code Annotated section 39-13-203 and was not a constitutional ruling. Id. at 609. The court further held that "a claim alleging ineligibility for the death penalty does not qualify as an actual innocence claim." Id. at 613. While remaining "committed to the principle that Tennessee has no business executing persons who are intellectually disabled," the court held that the petitioner failed to meet the requirements for reopening post-conviction proceedings. Id.

In addressing its holdings in Howell and Coleman, the court noted:

> Regrettably, several courts misconstrued our holding in Howell that Tenn. Code Ann. § 39-13-203(a)(1) established a "bright line rule" for determining intellectual disability. They understood this language to mean that courts could consider *only* raw I.Q. scores. Accordingly, these courts tended to disregard any evidence suggesting that raw scores could paint an inaccurate picture of a defendant's actual intellectual functioning. This was an inaccurate reading of Howell, in which we took pains to say that the trial court should "giv[e] full and fair consideration to all tests administered to the petitioner" and should "fully analyz[e] and consider[] all evidence presented" concerning the petitioner's I.Q.

Id. at 603 (citations omitted) (emphasis in original). The petitioner requested that the court remand his case for a new hearing on the issue of intellectual disability, just as the court had done in Coleman and in Smith v. State. See Smith v. State, 357 S.W.3d 322, 354-55 (Tenn. 2011); Coleman, 341 S.W.3d at 252-53. The court in Keen, however, rejected the petitioner's contention noting that Coleman and Smith took advantage of the one-year window for reopening their petitions following the recognition of the constitutional prohibition against executing intellectually disabled defendants in Van Tran and Atkins. Keen, 398 S.W.3d at 613. The petitioner in Keen failed to avail himself of that opportunity. Id.

## B. Writ of Error Coram Nobis

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999)

(citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Our supreme court has stated the standard of review as "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." State v. Vasques, 221 S.W.3d 514, 525-28 (Tenn. 2007) (citation omitted).

Unlike the grounds for reopening a post-conviction petition, the grounds for seeking a petition for writ of error coram nobis are not limited to specific categories. Harris v. State, 102 S.W.3d 587, 592 (Tenn. 2003). Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner establishes that he or she was "without fault" in failing to present the evidence at the proper time. Id. Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. Id. at 592-93. The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. Vasques, 221 S.W.3d at 527-28.

The State asserts that the petitioner's claim is barred by the statute of limitations. Coram nobis claims are subject to a one-year statute of limitations. Tenn. Code Ann. § 27-7-103. The statute of limitations is computed "from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). The issue of whether a claim is barred by an applicable statute of limitations is a question of law, which this court reviews de novo. See id. We must construe the coram nobis statute of limitations "consistent with the longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim." Id.

The one-year statute of limitations may be tolled on due process grounds if the petitioner seeks relief based upon newly discovered evidence of actual innocence. Wilson v. State, 367 S.W.3d 229, 234 (Tenn. 2012). In determining whether tolling is proper, the court must balance the petitioner's interest in having a hearing with the State's interest in preventing a claim that is stale and groundless. Harris, 301 S.W.3d at 145 (citing Workman v. State, 41 S.W.3d 100, 102 (Tenn. 2001)). Generally, "before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992). The Burford rule consists of three steps:

(1) determine when the limitations period would normally have begun to run; (2) determine whether the ground for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995).

The limitations period normally would have begun to run following the petitioner's trial in 1997. The petitioner filed his petition for writ of error coram nobis on January 23, 2013, approximately fourteen years after the one-year statute of limitations expired.

In 1990, Tennessee Code Annotated section 39-13-203, prohibiting the execution of intellectually disabled defendants, was enacted. The petitioner, however, did not raise the issue of intellectual disability during his 1997 trial. In 2001, our supreme court recognized that the execution of intellectually disabled defendants is constitutionally prohibited. See Van Tran, 66 S.W.3d at 798-99.

The petitioner contends that the trial court erred in concluding that the issue of intellectual disability was previously determined during post-conviction proceedings. According to the petitioner, he did not argue in his second amended post-conviction petition that he was ineligible for the death penalty due to his intellectual disability but argued that he was ineligible due to his "mental age."

We note that in the petitioner's second amended petition where he asserts that trial counsel were ineffective, he also asserts that his I.Q. scores fell within the intellectually disabled range. In raising an "Atkins/Roper Claim," the petitioner cited to Atkins and Van Tran, both of which held that the execution of intellectually disabled defendants was

-18-

unconstitutional. Although the petitioner did not specifically state in his "Atkins/Roper Claim" that he was intellectually disabled, this independent claim could be construed as an intellectual disability claim based upon the totality of the allegations raised in the second amended petition. The petitioner did not challenge the post-conviction court's findings on this issue in his appeal of the denial of post-conviction relief.

Regardless of whether the issue of intellectual disability was properly before the post-conviction court, the petitioner raised the issue in his first amended post-conviction petition filed in January 2002. Therefore, he recognized at the time of his post-conviction proceedings that intellectual disability was a possible issue.

The petitioner contends that the reports of Dr. Auble and Dr. Brown are "newly available" evidence or evidence that did not become available for presentation until after the trial concluded. While the petitioner acknowledges that his intellectual disability existed before trial, he argues that circumstances beyond his control prevented him from presenting such evidence. He maintains that his intellectual disability first became available for presentation following our supreme court's opinion in Coleman.

Generally, to qualify as newly discovered evidence, the evidence must not have been known to the defendant at the time of trial. Wlodarz v. State, 361 S.W.3d 490, 506 (Tenn. 2012). A narrow exception, however, exists where "'although not newly discovered evidence, in the usual sense of the term,'" the "'*availability*'" of the evidence "'is newly discovered.'" Harris, 301 S.W.3d at 160-61 (quoting Taylor v. State, 171 S.W.2d 403, 405 (Tenn. 1943)); see David G. Housler, Jr. v. State, No. M2010-02183-CCA-R3-PC, 2013 WL 5232344, at *44 (Tenn. Crim. App. Sept. 17, 2013).

Courts have applied this narrow exception where previously unavailable evidence became available following a change in factual circumstances. See, e.g., Taylor, 171 S.W.2d at 405 (applying the exception when at the time of trial, one witness was hospitalized and one witness was working outside the state and they later became available to testify); Misty Jane Brunelle v. State, No. E2010-00662-CCA-R3-PC, 2011 WL 2436545, at *10 (Tenn. Crim. App. June 16, 2011) (noting that the petitioner should have sought coram nobis relief when a DCS report that was known to the petitioner but sealed at the time of trial later became available), perm. app. denied (Tenn. Oct. 18, 2011). Many of these cases involve testimony of a co-defendant or a witness who previously refused to testify by asserting the constitutional privilege against self-incrimination. See, e.g., David G. Housler, Jr., 2013 WL 5232344, at *44; United States v. Guillette, 404 F. Supp. 1360, 1372-74 (D. Conn. 1975); Brantley v. State, 912 So. 2d 342, 343 (Fla. App. 2005); State v. Williams, 246 So. 2d 4, 6 (La. 1971); Commonwealth v. Brown, 431 A.2d 343, 344 (Pa. Super. Ct. 1981); State v. Gerdes, 258 N.W.2d 839, 843 (S.D. 1977).

The petitioner has failed to cite to any authority applying this narrow unavailability exception based upon a change in the law. Issues regarding whether a change in the law should apply post-trial relate to retroactivity and are more properly addressed in post-conviction proceedings or a motion to reopen post-conviction proceedings. Even if the unavailability exception applies to a change in law, the petitioner is not entitled to relief.

The petitioner argues that prior to Coleman, courts only could consider raw I.Q. scores in determining intellectual disability pursuant to Tennessee Code Annotated section 39-13-203(a)(1). The Tennessee Supreme Court in Keen, however, stated that Howell did not provide for such a limitation. Keen, 398 S.W.3d at 603. Rather, the court in Howell instructed trial courts to "'giv[e] full and fair consideration to all tests administered to the petitioner'" and to "'fully analyz[e] and consider[] all evidence presented'" concerning the petitioner's I.Q. Id. (quoting Howell, 151 S.W.3d at 459).

Moreover, the Tennessee Supreme Court noted in Coleman that its review of all cases involving the application of section 39-13-203 reflected that "the parties and the courts have not been limiting their consideration of whether a criminal defendant has a 'functional intelligence quotient of seventy (70) of below' to the defendant's raw I.Q. test scores." Coleman, 341 S.W.3d at 247. The court explained:

For example, in Cribbs v. State, both the State and Mr. Cribbs presented evidence that his raw I.Q. test scores did not accurately reflect his actual I.Q. On behalf of the State, Dr. Wyatt Nichols stated that Mr. Cribbs's intellectual level was actually higher than the I.Q. test score of 73 and was "[m]ore like the mid to high 80s." Cribbs v. State, 2009 WL 1905454, at *22, 32. Dr. Pamela Auble, appearing for Mr. Cribbs, stated in her initial report that his I.Q. was between 71 and 84. Cribbs v. State, 2009 WL 1905454, at *17. However, Dr. Auble later revised her opinion based on information obtained after her first report and concluded that Mr. Cribbs's I.Q. was below seventy. Cribbs v. State, 2009 WL 1905454, at *17. Based on all the evidence, the trial court concluded that the I.Q. test that produced the score of 73 was the most reliable. The trial court found that Dr. Auble's explanation for the change in her opinion was not credible and that Dr. Nichols's testimony was persuasive. Cribbs v. State, 2009 WL 1905454, at *32.

The consideration of I.Q. test scores in Cribbs v. State is but one example of cases in which the State has argued and presented evidence that scores on I.Q. tests should not be considered on their face value. See also State v. Strode, 232 S.W.3d at 5 (the State presented evidence challenging the score on the basis that the defendant had been malingering); Smith v. State,

2010 WL 3638033, at *30 (the State presented evidence that the defendant's I.Q. test score should be discounted because of malingering); Van Tran v. State, 2006 WL 3327828, at 4-6 (the State argued that the Vietnamese-born defendant's low I.Q. test score reflected cultural and linguistic bias).

Id. The Tennessee Supreme Court concluded that these cases reflected "the parties' and the courts' existing awareness that, as a practical matter, a criminal defendant's 'functional intelligence quotient' cannot be ascertained based only on raw I.Q. scores." Id. The court further concluded that the cases also reflected "the parties' conclusion that Tenn. Code Ann. § 39-13-203(a) does not prevent them from presenting relevant and competent evidence, other than the defendant's raw I.Q. test scores, either to prove or to disprove that the defendant's 'functional intelligence quotient' when the crime was committed was 'seventy (70) or below.'" Id. at 247-48.

The petitioner asserts that this court has recognized that the legal standard for establishing intellectual disability following Coleman is different from the legal standard prior to Coleman. The only case to which the petitioner cites that was decided following Keen is Sidney Porterfield v. State, No. W2012-00753-CCA-R3-PD, 2013 WL 3193420 (Tenn. Crim. App. June 20, 2013). The petitioner cites to a portion of Sidney Porterfield in which this court in summarizing Howell stated that "the demarcation of an I.Q. score of 70 was a 'brightline' rule that must be met." Sidney Porterfield, 2013 WL 3193420, at *22-23. We note that throughout Howell, the Tennessee Supreme Court referred to an "I.Q. score" and a "range of I.Q. scores." See Howell, 151 S.W.3d at 457-59. In Coleman, the court clarified that Howell did not limit the determination of a defendant's I.Q. to "raw I.Q. test scores." Coleman, 341 S.W.3d at 247. The sentence in Sidney Porterfield upon which the petitioner relies appeared in a section of this court's opinion where we provided a summary of Tennessee Supreme Court cases regarding the law of intellectual disability, much like the summary that we set forth above. In referring to "an I.Q. score of 70" as a "brightline rule," this court in summarizing Howell was merely employing the terminology used by our supreme court in Howell.

The petitioner in Sidney Porterfield did not raise the issue of whether the standard for determining intellectual disability prior to Coleman differed from the standard following Coleman, and this court did not address the issue. Rather, the Tennessee Supreme Court specifically held in Keen that Howell did not limit a court's determination of a defendant's I.Q. to raw I.Q. scores, and this holding in Keen controls.

We note that recently in Hall v. Florida, __ U.S. __, 134 S. Ct. 1986 (2014), the United States Supreme Court held that Florida courts' interpretation of the significantly subaverage intellectual functioning provision in Florida's intellectual disability statute is

unconstitutional. Florida courts interpreted the statute as requiring a strict I.Q. raw test score of 70 without consideration of the standard error of measurement. Hall, __ U.S. __, 134 S. Ct. at 2000. The Supreme Court agreed "with medical experts that when a defendant's I.Q. test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 2001. Unlike the defendant in Hall, however, the petitioner has not been precluded during his original trial or during post-conviction proceedings from presenting evidence, other than his raw I.Q. test scores, to establish that his "functional intelligence quotient" when he committed the murder was 70 or below.

Contrary to the petitioner's claims, the information in the affidavits of Dr. Auble and Dr. Brown was available for presentation prior to Coleman. Dr. Auble and Dr. Brown testified during post-conviction proceedings in August 2007, following the Tennessee Supreme Court's release of Howell in 2004. Nothing prevented the petitioner from presenting during post-conviction proceedings relevant and competent evidence, other than his raw I.Q. test scores, to prove that his "functional intelligence quotient" when the crime was committed was "seventy (70) or below."

Almost five years after Dr. Auble and Dr. Brown testified, the petitioner filed his petition seeking to present testimony from these same experts, both of whom reached a conclusion that differed from the conclusion they had reached during post-conviction proceedings. The information upon which Dr. Auble and Dr. Brown relied was available to the petitioner at the time of the trial and the post-conviction hearing. Nothing prevented Dr. Auble from administering I.Q. testing and the Independent Living Scale to the petitioner prior to the post-conviction proceedings. The new testing in 2012 is merely cumulative to the evidence previously available to the petitioner. See Wlodarz, 361 S.W.3d at 499 (noting that newly discovered evidence that is merely cumulative does not warrant the issuance of a writ). Because the petitioner's claim could have been litigated at trial or during post-conviction proceedings, the grounds are not "later-arising," justifying the tolling of the one-year statute of limitations. See Tenn. Code Ann. § 40-26-105(b) (confining coram nobis relief to "matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding" and requiring the defendant to show that he was without fault in failing to present the evidence at the proper time).

Even if Coleman provides new grounds for relief, the petitioner did not file his petition for writ of error coram nobis until January 2013, approximately twenty-one months following the issuance of Coleman. Moreover, the coram nobis petition does not relate back to the motion to reopen filed in April 2012. "No statute in Tennessee nor tolling rule developed at common law provides that the time for filing a cause of action is tolled during

-22-

the period in which a litigant pursues a related but independent cause of action." Harris, 301 S.W.3d at 146. When the petitioner filed his motion to reopen, he chose not to file a petition for writ of error coram nobis. It was not until after our supreme court released its opinion in Keen rejecting the bases upon which the petitioner relied in filing his motion to reopen that the petitioner filed a petition for writ of error coram nobis. A petitioner may not delay presenting a coram nobis claim until "every other avenue of relief ha[s] been exhausted." Billy Ray Irick v. State, No. E2010-02385-CCA-R3-PD, 2011 WL 1991671, at *18 (Tenn. Crim. App. May 23, 2011), perm. app. denied (Tenn. Aug. 25, 2011). Therefore, we conclude that under the circumstances of this case, the delay in seeking coram nobis relief is unreasonable.

We conclude that the trial court properly found that the petitioner's petition was barred by the one-year statute of limitations. Accordingly, the petitioner is not entitled to coram nobis relief.

## C. Declaratory Judgment

The petitioner asserts that the trial court erred in denying his motion for a declaratory judgment pursuant to Tennessee Code Annotated section 29-14-102. Section 29-14-102 provides that "[c]ourts of record within their respective jurisdictions have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." The State asserts that the petitioner's claim is barred by the doctrine of sovereign immunity.

Article I, section 17 of the Tennessee Constitution provides that "[s]uits may be brought against the State in such manner and in such courts as the Legislature may by law direct." "The traditional construction of the clause is that suits cannot be brought against the State unless explicitly authorized by statute." Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 849 (Tenn. 2008). Tennessee Code Annotated section 20-13-102 further provides: "No court in the state shall have any power, jurisdiction, or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds, or property . . . ."

Sovereign immunity generally extends to state agencies and state officers acting in their official capacity. Colonial Pipeline Co., 263 S.W.3d at 849. The doctrine of sovereign immunity, however, does not bar suits against state officers to prevent them from enforcing an allegedly unconstitutional statute. Id. at 849-50. Our supreme court has held that a "suit against state officers attacking the constitutionality of a statute of the State is not a suit against the State." Id. at 850 (citations omitted). The court reasoned as follows:

Essentially, an officer acting pursuant to an unconstitutional statute does not act under the authority of the state; thus, the officer does not enjoy the immunity that would normally be granted pursuant to official authority. In other words, the officer loses immunity when acting beyond the scope of the power of the State, and the power of the State is limited by the state and federal constitutions. The issue is not whether the State has waived sovereign immunity for this specific classification of suit; sovereign immunity simply does not attach.

Id.

The petitioner contends that the doctrine of sovereign immunity does not apply because he had made an "as-applied" challenge to the constitutionality of Tennessee Code Annotated section 40-23-116. This section provides for the removal of the defendant from the county in which he was convicted to the state penitentiary where the death chamber is located, identifies those who may witness the execution, and regulates photographic and recording devices. According to the petitioner, section 40-23-116 is unconstitutional as applied to him because he is intellectually disabled. The petitioner, however, did not challenge the constitutionality of section 40-23-116 in his declaratory judgment action filed in the trial court. Regardless, the petitioner is not entitled to relief regarding this issue.

The actual focus of the petitioner's challenge is not upon section 40-23-116 but upon the sentencing component of his judgment. Section 40-23-116 merely ensures the privacy of the execution. The petitioner seeks to raise an issue of intellectual disability. Regardless of whether the petitioner is intellectually disabled or not, the issue of intellectual disability has no effect on the constitutionality of section 40-23-116. The petitioner may not challenge the constitutionality of a statute in an effort to circumvent the doctrine of sovereign immunity when the statute has no relation to the issue that the petitioner actually seeks to raise. Accordingly, the doctrine of sovereign immunity applies to bar the petitioner's declaratory judgment action against the State.

**D. Intellectual Disability Statute**

The petitioner asserts that the intellectual disability provisions in Tennessee Code Annotated section 39-13-203 provide an independent cause of action allowing him to challenge his eligibility for the death penalty. In construing a statute, we must ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. State v. Strode, 232 S.W.3d 1, 9 (Tenn. 2007). We must give the words in the statute their natural and ordinary meaning in light of their statutory context. Keen, 398 S.W.3d at 610. We must avoid any "forced or subtle

-24-

construction that would limit or extend the meaning of the language." Id. (citation omitted). "If the statutory language is clear and unambiguous, we apply the statute's plain language in its normal and accepted use." Id.

Tennessee Code Annotated section 39-13-203 lists the requirements of intellectual disability, the burden of proof, and the procedure when the issue is raised at trial. The plain language of the statute does not create an independent cause of action allowing a defendant to challenge his or her eligibility for the death penalty. Had the General Assembly intended to create a separate and independent cause of action in which to allege intellectual disability, they would have stated so in the statute. See, e.g., Tenn Code Ann. § 40-30-301 *et seq.* (creating a cause of action to allow certain defendants to request DNA testing of evidence). The petitioner is not entitled to relief with regard to this issue.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-25-